IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ERIC YERKES, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action<br>No. 17-2493(JBS/AMD) |
| ANAPOL WEISS, | |
| Defendant. | **OPINION** |

APPEARANCES:

Edward T. Kang, Esq.
David Ryan Scott, Esq.
KANG HAGGERTY & FETBROYT LLC
123 S. Broad St., Suite 1670
Philadelphia, PA 19109
     Attorneys for Plaintiff

Joseph Goldberg, Esq.
WEBER, GALLAGHER, SIMPSON, STAPLETON, FIRES & NEWBY, LLP
2000 Market St., 13th Floor
Philadelphia, PA 19103
     Attorney for Defendant

**SIMANDLE, Judge:**

## I.    INTRODUCTION

Plaintiff Eric Yerkes brings this malpractice and breach of contract case against Defendant, Annapolis Weiss, the law firm of his former attorney, on the grounds that Defendant committed legal malpractice and breached its contract with him when Plaintiff's lawyer, Paul Anapol, negligently misrepresented that certain annuity payments provided for in a settlement agreement,

negotiated by Anapol, would be or were "guaranteed." [Docket
Item 1.] This matter is before the Court on Defendant's motion
to dismiss on the basis of the statute of limitations, or, in
the alternative, Pennsylvania's Muhammad[1] doctrine or New
Jersey's "Entire Controversy Doctrine." [Docket Item 11.]
Plaintiff has filed a Response [Docket Item 16], Defendant has
filed a Reply [Docket Item 18], and (with leave of the Court
[Docket Item 20]), Plaintiff has filed a sur-Reply [Docket Item
21].

The Court is obliged to undertake a choice of law analysis,
first as to the statute of limitations, and subsequently to the
substantive law, to determine whether Defendant's motion is
properly granted. For the reasons that follow, the Court will
deny Defendant's motion.


## II. BACKGROUND[2]

Plaintiff Eric Yerkes, a New Jersey resident at all
relevant times, was involved in a plane crash in a Cessna
airplane, along with his brother, near the Grand Canyon in
Arizona in 1981, whereupon he suffered severe and permanent

---

[1] Muhammad v. Strassburger, McKenna, Messer, Shilobod and
Gutnick, 526 Pa. 541 (1991).

[2] For purposes of the pending motion, the Court accepts as true
the version of events set forth in the complaint, documents
explicitly relied upon in the complaint, and matters of public
record. See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014).

injuries. [Docket Item 1 ¶¶ 7-8.] Paul Anapol, Esq., (deceased as of 2012), solicited the business of Plaintiff's brother in New Jersey, who then passed along Mr. Anapol's information to Plaintiff. Id. ¶ 11. Plaintiff then retained Mr. Anapol and his law firm, then known as Anapol, Schwartz, Weiss, and Schwartz, P.C., and now known as Anapol Weiss (the named Defendant here), to represent him in connection with the plane crash; Mr. Anapol sent Plaintiff an engagement letter at his home in New Jersey, and Plaintiff's mother agreed on to the representation on behalf of Plaintiff (then a minor). Id. ¶¶ 10, 12. Defendant communicated with Plaintiff at his home in New Jersey throughout the course of Defendant's representation. Id. ¶ 13.

With the assistance of Defendant, Plaintiff sued both Cessna and the operator of the airplane in the United States District Court for the District of Arizona, "Docket No. CV-83-01616-PHX-WPC for the injuries he sustained in the crash." Id. ¶ 14. Plaintiff settled with the airplane operator on or about April 6, 1984 on Defendant's advice. Id. ¶ 15.

On or about April 1, 1986, "Plaintiff entered into a Release and Indemnity Agreement and Assignment Agreement with Cessna (the 'Cessna Settlement Agreement') that yielded Plaintiff a cash payment of $125,000 and periodic payments consisting of $1,000 a month for life and the following lump sum payments (the 'Periodic Payment')":

```
$25,000 payable in 5 years (February 1991)
$40,000 payable in 10 years (February 1996)
$70,000 payable in 15 years (February 2001)
$125,000 payable in 20 years (February 2006)
$200,000 payable in 25 years (February 2011)
$350,000 payable in 30 years (February 2016)
$450,000 payable in 35 years (February 2021)
$600,000 payable in 40 years (February 2026)
$900,000 payable in 45 years (February 2031)
$1,200,000 payable in 50 years (February 2035)
$2,000,000 payable in 55 years (February 2041)
```

Id. ¶ 16. Plaintiff also "received an additional $150,000 cash settlement" from the airplane operator, pursuant to its own settlement agreement, once he executed the Cessna Settlement Agreement. Id. ¶ 19.

Plaintiff states: "As part of the Cessna Settlement Agreement, Cessna purchased an annuity policy from Executive Life Insurance Company of New York (ELNY) for the payment of the Periodic Payments to Plaintiff and assigned all of its obligations under the Cessna Settlement Agreement to ELNY (the 'Annuity'). The assignment of Cessna's obligations under the Cessna Settlement Agreement was approved by Plaintiff upon the advice of the Defendant. In entering into the Cessna Settlement Agreement, Plaintiff was assured by the Defendant that the Periodic Payments were 'guaranteed.'" [Docket Item 1 ¶¶ 20-22.] In fact, the "Recapitulation/Distribution sheet" given to Plaintiff by Defendant "states that under the Cessna Settlement Agreement 'All Periodic Payments Guaranteed to Eric N. Yerkes By The Cessna Aircraft Company' and 'The Total Payout, Assuming a

59 Year Life-Expectancy is $6,668,000.00 of Which All but the Sum of $468,000 is Guaranteed by Cessna.'" Id. ¶ 23. Plaintiff notes that, as a result of Defendant taking into account the Periodic Payments, "from the $275,000.00 lump-sum payments, Plaintiff only received $43,472.06 while the remaining $231,527.94 was paid to the Defendant for its services" as a contingency fee. Id. ¶¶ 24-27.

In subsequent years, ELNY experienced financial trouble and was placed in conservation under the California Insurance Commissioner and entered into rehabilitation under Section 7402 of the New York Insurance Law in 1991, although Plaintiff continued to receive his scheduled Periodic Payments. Id. ¶¶ 29-31.

Twenty-one years later, in 2012, the New York Supreme Court, Nassau County, "entered an order finding ELNY to be insolvent and approved a restructuring agreement of ELNY pursuant to which ELNY's assets were liquidated and restructured." Id. ¶ 32. The Guaranty Association Benefits Company ("GABC") "took over the assets of ELNY," including Plaintiff's annuity that Cessna had purchased pursuant to the Cessna Settlement Agreement, on August 8, 2013. Id. ¶ 33. Up to that point, Plaintiff continued to receive monthly payments and the Periodic Payments in their full prescribed amounts. Id. ¶ 34. "By letter dated October 13, 2014, Plaintiff was informed

by GABC that the Periodic Payments were reduced by 56.46% to a total of just 43.54% of their original amount effective August 8, 2013." Id. ¶ 35. Because the New York Supreme Court had approved this arrangement, Plaintiff was left "with no recourse against ELNY or GABC." Id. ¶ 36. Both the monthly payments and the periodic payments have been so reduced, and Plaintiff (who continues to reside in New Jersey) has been accordingly damaged in New Jersey. Id. ¶ 37.

Plaintiff called Defendant after learning of the reduction; one of Defendant's lawyers, Joel Feldman, advised Plaintiff that he "would have to sue Cessna for the reduction" although Defendant could not represent him; Plaintiff subsequently filed such a suit in the U.S. District Court for the District of New Jersey, No. 1:14-cv-05925-RMB-JS, against Cessna for breach of contract and unjust enrichment. Id. ¶ 39-40. That case was dismissed on March 24, 2016 "upon a finding that the Cessna Settlement Agreement and Cessna's purchase of the annuity from ELNY fully released Cessna from all obligations for the Periodic Payments." Id. ¶ 41. Plaintiff states that this ruling contradicted what Defendant told him: namely, that the payments were "guaranteed" by Cessna. Id. ¶¶ 42-43.

Plaintiff states that he would not have entered into the Cessna Settlement Agreement "but for the representations of the Defendant that the Periodic Payments were guaranteed" when "in

actuality, the Periodic Payments were in no way guaranteed by
Cessna or anyone else and depended entirely upon the financial
health and stability of ELNY"; as a result of Defendant's breach
of its duty owed to Plaintiff and failure to exercise the level
of skill, care, and knowledge commonly exercised by members of
the legal profession, "Plaintiff is no longer receiving the full
benefit of the Cessna Settlement Agreement that the Defendant
encouraged him to enter into and which Plaintiff believed he
would receive[,]" resulting in damages over the life of the
Cessna Settlement Agreement in excess of $3,000,000.00. Id. ¶¶
44-49.

Plaintiff submits that he did not discover Defendant's
negligence "and his damages from the Defendant's malpractice did
not become fixed until the March 24, 2016 Order that dismissed
his claims against Cessna that the Defendant advised him to
bring." Id. ¶¶ 50.

Plaintiff claims Defendant is liable for legal malpractice
(Count I, id. ¶¶ 51-62), unjust enrichment (Count II, id. ¶¶ 63-
72), and breach of contract (Count III, id. ¶¶ 73-77).

## III. STANDARD OF REVIEW

Pursuant to Rule 8(a)(2), Fed. R. Civ. P., a complaint need
only contain "a short and plain statement of the claim showing
that the pleader is entitled to relief." Specific facts are not
required, and "the statement need only 'give the defendant fair

notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citations omitted). While a complaint is not required to contain detailed factual allegations, the plaintiff must provide the "grounds" of his "entitle[ment] to relief", which requires more than mere labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

A motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that the plaintiff failed to set forth fair notice of what the claim is and the grounds upon which it rests. Id. A complaint will survive a motion to dismiss if it contains sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Id. at 678.

"Under Fed. R. Civ. P. 8(c), the statute of limitations constitutes an affirmative defense to an action. Under the law of this other circuits, however, the limitations defense may be raised on a motion under Rule 12(b)(6), but only if the time

alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." Bethel v. Jendoco Const. Corp., 570 F.2d 1168, 1174 (3d Cir. 1978)(internal citations and quotations omitted). "If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." Id.

## IV. ANALYSIS

Defendant moves to dismiss on the basis of the statute of limitations, Pennsylvania's Muhammad doctrine (if this Court determines Pennsylvania law applies), and/or New Jersey's "Entire Controversy" doctrine (if this Court determines New Jersey law applies). [Docket Item 11.] The Court will first address the statute of limitations.

### A. Statute of Limitations

Defendant argues that Plaintiff filed this action beyond the statute of limitations, and that it must be dismissed as untimely. Accordingly, the Court must determine the appropriate statute of limitations period to assess whether Plaintiff's suit was filed within the limitations period or, if not, if any part of the period was tolled such that he may maintain his suit.

Plaintiff asserts the Court's jurisdiction is based on 28 U.S.C. § 1332 "as there is complete diversity of citizenship between the Plaintiff and the Defendant and the amount in

controversy is in excess of $75,000. . . . Plaintiff is a
citizen of New Jersey while the Defendant is a citizen of
Pennsylvania." [Docket Item 1 ¶ 3.] "A federal court sitting in
diversity applies the choice-of-law rules of the forum state—
here, New Jersey—to determine the controlling law." <u>Maniscalco</u>
<u>v. Brother Intern. (USA) Corp.</u>, 709 F.3d 202, 206 (3d Cir.
2013).

"The first inquiry is whether the laws of the states with
interests in the litigation are in conflict. If there is no
actual distinction, there is no choice-of-law issue to be
resolved, and the forum state applies its own substantive law."
<u>In re Accutane Litigation</u>, No. 271 (MCL), 2017 WL 3138003, at
*24 (N.J. Sup. Ct. App. Div. July 25, 2017)(internal citations
omitted).

Defendant argues that Pennsylvania's statute of limitations
applies; Plaintiff argues that New Jersey's does.

In 2017, the New Jersey Supreme Court held that, in a tort
action, "section 142 of the [<u>Restatement (Second) of Conflicts</u>
<u>of Law</u>] is now the operative choice-of-law rule for resolving
statute-of-limitations conflicts[.]" <u>McCarrell v. Hoffmann-La</u>
<u>Roche, Inc.</u>, 227 N.J. 569, 574, 583 (2017). Under Section 142 of
the Second Restatement, "the statute of limitations of the forum
state—here, New Jersey—applies if that state has a substantial
interest in the maintenance of the claim and there are no

'exceptional circumstances' that 'make such a result

unreasonable.'" <u>Id.</u> (citing <u>Restatement (Second) of Conflicts of

Law</u> § 142).

Section 142 states:

Whether a claim will be maintained against the defense
of the statute of limitations is determined under the
principles stated in § 6. In general, unless the
exceptional circumstances of the case make such a
result unreasonable:

(1)  The forum will apply its own statute of
limitations barring the claim.

(2)  The forum will apply its own statute of
limitations permitting the claim unless:

   (a)  maintenance of the claim would serve no
   substantial interest of the forum; and

   (b)  the claim would be barred under the statute
   of limitations of a state having a more
   significant relationship to the parties and the
   occurrence.

Restatement (Second) § 142.

The New Jersey Supreme Court explains: "Under Section

142(2)(a), the statute of limitations of the forum state

generally applies whenever that state has a substantial interest

in the maintenance of the claim. In that circumstance, the

inquiry ends for statute-of-limitations purposes, unless

exceptional circumstances would render that result unreasonable.

Only when the forum state has 'no substantial interest' in the

maintenance of the claim does a court consider Section

142(2)(b)—whether 'the claim would be barred under the statute

11

of limitations of a state having a more significant relationship to the parties and the occurrence.'" McCarrell, 227 N.J. at 593 (internal citations omitted). "Second Restatement section 142 makes clear that when New Jersey has a substantial interest in the litigation and is the forum state, it will generally apply its statute of limitations." Id. "Section 142's presumption in favor of a forum state with a substantial interest in the litigation can be overcome only by exceptional circumstances that would render that result unreasonable. . . . For all practical purposes, under § 142, once a court finds that the forum state has a substantial interest in the litigation, the inquiry is at an end." Id. at 596.

While the court in McCarrell applied § 142 in tort actions, the Appellate Division has expanded the application of § 142 to contractual disputes as well. See Berkley Risk Solutions, LLC v. Industrial Re-International, Inc., No. L-0163-15, 2017 WL 4159170, at *7-*8 (N.J. Sup. Ct., App. Div., Sept. 20, 2017). Accordingly, this Court applies § 142 to determine the applicable statute of limitations in this case to the extent that there is conflict between them.

New Jersey's statute of limitations for legal malpractice and contract actions is six years. N.J.S.A. 2A:14-1; McGrogan v. Till, 167 N.J. 414, 417 (2001). Pennsylvania's statute of limitations for professional negligence is two years, and four

years for breach of contract claims. 42 Pa.C.S. §§ 5524(3),

5525; Wachovia Bank, N.A. v. Ferretti, 935 A.2d 565, 571 (Pa.

Super. Ct. 2007). Because the Court discerns a conflict in the

respective statutes of limitations, it will apply § 142 of the

Second Restatement under New Jersey law to determine which

statute of limitations should apply.

Accordingly, the Court first assesses only whether New

Jersey, as the forum state, has a "substantial interest" in the

litigation. See Restatement (Second) § 142(2)(a). The Court has

little difficulty in concluding that New Jersey has such an

interest. Plaintiff is and has been at all times a resident of

New Jersey and claims that he was harmed in New Jersey as a

result of Defendant's professional negligence and breach of

contract. The funds at issue in this case were to secure his

long-term well-being in New Jersey. While Pennsylvania may also

have a significant interest in the litigation (or a more

significant interest, see infra), for purposes of the statute of

limitations, New Jersey need only also have such an interest.

See Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., L.L.C.,

450 N.J. Super. 1, 60-62 (App. Div. 2017)("no doubt" that New

Jersey "has a substantial interest" where one of the plaintiffs

"has its principal place of business in New Jersey and claims

injuries to its business caused by the alleged disparagement of

it and its products"; "exceptional circumstances" "not remotely

suggested here" although New York has a "more significant relationship to the parties and the occurrence").

Furthermore, the Court discerns no "exceptional circumstances" that would render the application of the New Jersey statute of limitations "unreasonable." Restatement (Second) § 142. Defendant argues that the commentary to § 142 states that "where the domicil [sic] of the plaintiff is in the state of the forum and that of the defendant is in the other state with the most significant relationship to important issues in the case[,] . . . the forum should entertain the claim only in extreme and unusual circumstances." Restatement (Second) of Conflicts of Laws § 142, Comment g. Defendant urges that these are not "extreme and unusual circumstances." Nevertheless, the Court is mindful of the clear statement of the New Jersey Supreme Court in McCarrell that "[f]or all practical purposes, under § 142, once a court finds that the forum state has a substantial interest in the litigation, the inquiry is at an end." 227 N.J. at 596. The Court does not discern the requisite extreme circumstances that would render applying the New Jersey statute of limitations unreasonable, notwithstanding Comment g.

Accordingly, the Court applies § 142 and concludes that, pursuant to its provisions, New Jersey's statute of limitations period of six years applies to Plaintiff's claims as stated in the Complaint.

In applying that statute of limitations to the instant matter, the Court looks to the New Jersey Supreme Court, which has stated:

> Ordinarily, a cause of action accrues when an attorney's breach of professional duty proximately causes a plaintiff's damages. We have recognized, however, the unfairness of an inflexible application of the statute of limitations when a client would not reasonably be aware of the underlying factual basis for a cause of action to file a timely complaint. To guard against that inequity, we have applied the discovery rule in those cases in which the injury or wrong is not readily ascertainable through means of reasonable diligence. We understand that in some circumstances a client may not be able to detect the essential facts of a malpractice claim with ease or speed because of the complexity of the issues or proceedings, or because of the special nature of the attorney-client relationship. Accordingly, <u>the statute of limitations does not commence until the client suffers actual damage</u> and discovers, or through the use of reasonable diligence should discover, the facts essential to the malpractice claim.

<u>Vastano v. Algeier</u>, 178 N.J. 230, 236 (2003)(internal citations and quotations omitted)(emphasis added).

Here, Defendant argues that the alleged malpractice or breach of duty occurred in 1986, when the Cessna Settlement Agreement was negotiated and presented to Plaintiff, and Plaintiff was advised to sign it on the basis of an alleged misrepresentation by Mr. Anapol. [Docket Item 11-1 at 16.] Defendant also implicitly recognizes the application of the discovery rule to these facts, however, and argues that Plaintiff "should have been aware that his periodic payments may

be jeopardized" due to ELNY's financial instability as early as 1991. Id. at 11-1 at 16-17. Finally, Defendant submits that, at the latest, Plaintiff "should have been aware that his periodic payments were going to be reduced by December 2011" and that "Defendant[] will be able to prove Plaintiff was aware by December 2011 or January 2012" because Plaintiff "was put on notice that ELNY was facing liquidation and that his payments would be reduced[.]" Id. at 17-18.

However, as Plaintiff ably points out, although his payments may have been in jeopardy earlier, his actual periodic payments "were not jeopardized until August 8, 2013[,]" because, until that date, he "received the full value of the Periodic Payments." [Docket Item 16 at 17-18, citing Compl. ¶ 34.] Plaintiff argues, and the Court agrees, that a "potential for future harm does not constitute actual harm and therefore does not give rise to a cause of action." [Docket Item 16 at 18.] See Olds v. Donnelly, 150 N.J. 424, 439 (1997)(because "trial court's dismissal of [plaintiff's] medical-malpractice complaint for untimely service was not mandatory[,]" attorney's negligence "did not proximately cause actual damage" to plaintiff "until the trial court actually dismissed with prejudice" plaintiff's complaint against doctor because "[o]nly then did [plaintiff] suffer real and substantial, as opposed to speculative, damage").

Under Vastano, the statute of limitations does not begin to run until the client suffers actual damage. While the breach of the duty may have occurred in 1986, Plaintiff was not damaged by such a breach until his payments were actually reduced, which occurred in 2013. To note the counterfactual, the Court takes as well-founded Plaintiff's argument [Docket Item 16 at 20] that he would likely have been precluded from maintaining a malpractice claim before 2013 against Defendant on the grounds that Plaintiff had not (to that point) suffered any non-speculative damages from the alleged breach of duty in 1986--after all, he continued to receive the full value of the settlement.

Accordingly, the Court holds that the statute of limitations began to run when Plaintiff suffered actual damages by the reduction of his periodic payments on August 8, 2013. As he filed this suit on April 12, 2017, he timely filed within the six-year statute of limitations. The Court therefore need not address whether the discovery rule further tolled the limitations period. Defendant's motion to dismiss on this ground is therefore denied.

## B. Substantive Law: Entire Controversy Doctrine

Defendant's additional arguments rely on a substantive choice-of-law analysis to determine the applicable law. [Docket Item 11-1 at 18-21, 24-26.] Accordingly, the Court must determine the applicable substantive law that pertains to

Plaintiff's claims and Defendant's arguments and again looks to New Jersey's choice-of-law rules.

The Court first notes that a threshold question is whether "an actual conflict exists between the laws of jurisdictions with ties to a case." Grossbaum v. Genesis Genetics Inst., LLC, 489 Fed. App'x 613, 616 (3d Cir. 2012). Plaintiff submits that Defendant has not demonstrated such a conflict in the substantive laws of Pennsylvania and New Jersey and therefore a choice-of-law analysis regarding substantive law is unnecessary. [Docket Item 16 at 27-28, citing Camp Jaycee, 197 N.J. at 143.] Plaintiff argues that the only substantive conflict Defendant has identified is the availability of attorney's fees to a successful plaintiff in a legal malpractice case [Docket Item 16 at 27, citing Docket Item 11-1 at 13.] However, the Court notes that Defendant has also moved to dismiss based on alternate state common-law grounds: Pennsylvania's Muhammad doctrine and New Jersey's Entire Controversy Doctrine. The Court will assume, without deciding, that each doctrine would not be applicable were the substantive law of another jurisdiction held to apply to this action and will likewise assume without deciding that this creates an actual conflict of law requiring analysis of the most significant relationship of the jurisdictions to the parties or issues.

Rather than § 142, New Jersey applies the "most significant relationship" test with regard to choice-of-law for substantive issues of law. P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 136 (2008). "Under that standard, the analysis in a personal injury case begins with the section 146 [of the Second Restatement] presumption that the local law of the state of the injury will apply. Once the presumptively applicable law is identified, that choice is tested against the contacts detailed in section 145 and the general principles outlined in section 6 of the Second Restatement. If another state has a more significant relationship to the parties or issues, the presumption will be overcome. If not, it will govern." Id.

Section 146 states: "In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied." Restatement (Second) of Conflict of Laws § 146. Section 6 provides that a "court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law" and, in the absence of such directive, should consider the following "factors relevant to the choice of the applicable rule of law":

(a)  the needs of the interstate and international systems,
(b)  the relevant policies of the forum,
(c)  the relevant policies of other interested states and the
     relative interests of those states in the determination
     of the particular issue,
(d)  the protection of justified expectations,
(e)  the basic policies underlying the particular field of
     law,
(f)  certainty, predictability and uniformity of result, and
(g)  ease in the determination and application of the law to
     be applied.

Id. § 6. The Restatement also discusses factors to be taken into

account specifically with regard to torts:

(1)  The rights and liabilities of the parties with respect to
     an issue in tort are determined by the local law of the
     state which, with respect to that issue, has the most
     significant relationship to the occurrence and the
     parties under the principles stated in § 6.
(2)  Contacts to be taken into account in applying the
     principles of § 6 to determine the law applicable to an
     issue include:
     (a)  the place where the injury occurred,
     (b)  the place where the conduct causing the injury
          occurred,
     (c)  the domicil, residence, nationality, place of
          incorporation and place of business of the parties,
          and
     (d)  the place where the relationship, if any, between
          the parties is centered.
     These contacts are to be evaluated according to their
     relative importance with respect to the particular issue.

Id. § 145.

     The Court begins by identifying "the state where the injury

occurred" pursuant to § 146, as the local law of that state is

presumptively applicable. From Section 145, the Court notes the

conceptual distinction between "the place where the injury

occurred" and "the place where the conduct causing the injury

occurred." Such a distinction is relevant to the instant question. Mr. Anapol's alleged breach--his negligent misrepresentation--is not particularly easy to locate, geographically. Per the Complaint, he recommended settling an Arizona lawsuit, making representations to a client located in New Jersey, allegedly from his office in Pennsylvania, and subsequently assisted the Plaintiff in executing the Cessna Settlement Agreement in Arizona. To the extent that the "injury" is deemed to be equivalent to the "breach," it is difficult to precisely locate it in one state. To that end, the Court finds § 145's conceptual distinction between the place where the injury occurred and the place where the conduct causing the injury occurred to be illuminating to the analysis under § 146. Using that rubric, the Court can distinguish between Mr. Anapol's conduct "causing the injury" and the injury itself-- which, accordingly then, is the diminution in the periodic payments to Plaintiff. By analogy, a person who shoots a gun from behind the New Jersey border over the state line into Pennsylvania and injures another person exhibits "conduct causing the injury" in New Jersey, but the "injury" itself "occurs" in Pennsylvania. Turning back to the instant matter, the Court therefore concludes that the injury here occurred in New Jersey--where Plaintiff has resided at all relevant times, where he received his diminished payments, and where he suffered

the effects of that diminishment. Accordingly, New Jersey law is presumptively applicable under § 146.

The Court next turns to the question of whether another state "has a more significant relationship" "to the occurrence and the parties," considering the factors in §§ 6 and 145. See Camp Jaycee, 197 N.J. at 136.

Plaintiff argues that New Jersey has the most significant relationship to the occurrence and the parties because "New Jersey is "the situs of the injury" as the injury Plaintiff allegedly suffered was "the reduction of payments which were to be made to Plaintiff in New Jersey" and because Defendant communicated with Plaintiff "by sending mail and placing phone calls to Plaintiff in New Jersey[,]" thereby implying that the misrepresentation at issue "likely took place in New Jersey." [Docket Item 16 at 26-27.] Plaintiff also argues that Plaintiff is a New Jersey citizen, and although Defendant is a citizen of Pennsylvania, "it also maintains an office and place of business in New Jersey"; that "the relationship between the parties was centered in New Jersey, where Plaintiff resided and where the Defendant regularly placed calls and sent mail" or that the relationship was alternately centered in Arizona, the location of the underlying litigation and eventual settlement. Id. at 27. Accordingly, Plaintiff states, "New Jersey . . . has the most

significant relationship to the matter and its [substantive] law
applies." Id.

In contrast, Defendant argues, first, that the harm did not
occur in New Jersey, but rather where the diminished payments
were mailed from and actually reduced (either in New York or
Illinois), or in the alternative, "where the alleged breach of
duty and contract occurred, which was where Defendant allegedly
stated that the payments were guaranteed. Plaintiff has provided
no evidence to suggest that . . . he received this advice in New
Jersey instead of Pennsylvania or Arizona." [Docket Item 18 at
6-7.]

The Court does not find this analysis persuasive. As
discussed above, the Court finds the site of the injury to be
New Jersey, as that was where Plaintiff suffered the injury--as
distinct from where the conduct causing that injury occurred,
which remains an unsettled question of fact, although Plaintiff
alleges that the misrepresentations were heard and accepted by
him via telephone calls or letters placed or sent by Defendant
to New Jersey. See David B. Lilly Co. v. Fisher, 18 F.3d 1112,
1120 (3d Cir. 1994)(though lawyers were located in Missouri and
Washington, D.C., "as a practical matter, . . . the[ir] services
were rendered in Delaware" where client whom they advised was a
Delaware corporation merging with a newly created Delaware

corporation and "surviving corporation then continued its operations in Delaware").

Defendant then argues that analysis under the factors of § 6 show that "Pennsylvania has a more significant relationship to the Plaintiff's claims and therefore, Pennsylvania law should be applied." [Docket Item 18 at 7.] This is so primarily because "Defendant's alleged conduct leading to the harm occurred in Pennsylvania, not New Jersey." Id. In support, Defendant cites McHale v. Kelly, No. 11-143, 2011 WL 4899987, at *7-*9 (D.N.J. Oct. 14, 2011)("McHale I").

The Court has examined several cases involving claims of malpractice, legal and otherwise, that span one or more states, and has not found a precedent that squarely addresses the factual contours of the instant case.

The Third Circuit has held that, when determining which state has the most significant interest in a legal malpractice claim, "our assessment of the center of the relationship between the parties is the cornerstone of our analysis. The remaining factors [of §§ 145 and 6] are of lesser importance." Lilly, 18 F.3d at 1119. The court then upheld the application of Delaware law to a claim of legal malpractice filed by a Delaware corporation against lawyers in Missouri, New York, and Washington, D.C.:

No single state is the place of business for all the
parties, and in a tort action, as opposed to a
contract or property action, the parties' expectations
and the premium on certainty and predictability
provide weaker rationales for applying a particular
state's law. The needs of the interstate system and
the ease in determining and applying the law are also
relatively neutral considerations in this case.

The place where the injury occurred is Delaware which
is also the center of the web of relationships between
the parties. Although the post-acquisition corporate
structure [constructed according to the defendants'
advice, that subsequently harmed the plaintiff's
business] was established in New York when the
transaction closed, the Lilly Co. was not injured
until its small business deficiency was discovered.
Delaware has an interest in compensating victims for
injuries resulting from legal malpractice and provides
a cause of action for such injuries. Moreover,
Delaware has a particular stake in protecting its
legal consumers from negligent attorneys when the
resulting injury occurs in Delaware. . . .

The alleged negligence thus was committed by attorneys
whose legal services originated in other states. As a
practical matter, however, these services were
rendered in Delaware. Although a state has an obvious
interest in regulating the conduct of its own licensed
professionals, this interest is not dispositive. Our
task is to determine which state has the most
significant relationship to the occurrence and parties
in light of all the relevant principles.

The relational strands between the parties in this
lawsuit span several states. . . . Although the center
of Cadwalader's relationship with the Lilly Co. is
less clear, the entire web of relationships between
the Lilly Co., the Fisher defendants and Cadwalader is
centered in Delaware. Cadwalader's input foreseeably
resulted in the flawed structuring of a Delaware
corporation, and the purpose of the relationship
between Cadwalader and the Fisher defendants was to
facilitate the acquisition of a Delaware corporation.
We conclude that New York and Washington, D.C. have
little relationship to either the alleged legal
malpractice or the parties, and that Delaware has the

most significant relationship to both. Accordingly, we
hold that Delaware law should apply both to the Lilly
Co.'s claims and the Fisher defendants' cross-claims.

Id. at 1119-20 (internal citations omitted).

In O'Boyle v. Braverman, the Third Circuit upheld the

application of Tennessee law where the

> alleged injury at issue is the dismissal of the
> Tennessee suit and the Tennessee court's imposition of
> sanctions. Both this injury and the conduct that
> caused the injury—Braverman's allegedly improper
> handling of the Tennessee litigation—occurred in
> Tennessee. Appellees' [sic] involvement in the
> Tennessee lawsuit arose out of their status as general
> partners in New Midland, a Tennessee General
> Partnership with its principal place of business in
> Tennessee. As the Appellants hired Braverman "for the
> purpose of filing a lawsuit . . . in Tennessee," the
> parties' relationship is centered in Tennessee. The
> only factors weighing in favor of the application of
> New Jersey law are [one plaintiff's] New Jersey
> citizenship and the fact that Braverman is a member of
> the New Jersey bar. These factors are insufficient to
> overcome the fact that Tennessee has the most
> significant relationship to a claim of legal
> malpractice arising out of litigation that took place
> in its courts and involved an entity formed under its
> laws.

337 Fed. App'x 162, 167 (3d Cir. 2009)non-precedential (internal

citations omitted).

In Grossbaum, the Third Circuit held that a medical

malpractice claim for negligently implanting embryo with two

genes for cystic fibrosis was properly analyzed, under the

"most-significant-relationship" test, under New York law;

despite the parents having spent the last days of pregnancy in

New Jersey and their cystic-fibrosis-afflicted daughter being

born in New Jersey, all of the other interactions regarding

their preimplantation genetic diagnosis procedures, IVF, and

genetic counseling (which were allegedly negligently performed)

occurred in New York, as did most of the duration of Ms.

Grossbaum's pregnancy. 489 Fed. App'x at 616.

In McHale v. Kelly ("McHale II"), the Third Circuit upheld

the district court's determination in an earlier, separate

action (McHale I) that Pennsylvania law should apply, rather

than New Jersey law, under the most-significant-relationship

test because the lower court

> properly concluded that the relevant contacts,
> considered qualitatively, point to the application of
> Pennsylvania law. The McHales are domiciled in New
> Jersey, and New York is where the automobile accident
> occurred and where Kelly filed suit. All of the other
> relevant contacts, however, are with Pennsylvania:
> Kelly is domiciled in Pennsylvania and practiced law
> through a Pennsylvania law firm; he initiated the
> uninsured motorist action in Pennsylvania; he
> negotiated the McHales' settlement in Pennsylvania and
> the settlement agreement is governed by Pennsylvania
> law; and the insurance policy providing the lion's
> share of that settlement was issued in Pennsylvania. .
> . . [W]e agree that these contacts give Pennsylvania
> the most significant relationship with this suit[.]

527 Fed. App'x 149, 153 (3d Cir. 2013) (non precedential).

Certain lower court cases have also addressed this issue,

providing additional persuasive explications of these issues but

not precise clarity. See, e.g., RBC Bank (USA) v. Riley, Riper,

Hollin & Colagreco, No. 09-cv-00431, 2009 WL 2580354, at *3, *8

(D.N.J. Aug. 19, 2009)("Defendant argues that the [legal

malpractice] claim arose in Pennsylvania because the transaction
at issue is a Pennsylvania transaction, handled by Pennsylvania
attorneys, practicing law from Pennsylvania. However, even
though Defendants may have been physically in Pennsylvania
during the transaction, Defendants, licensed to practice law in
New Jersey, were hired, _inter alia_, to handle a transaction
dealing with New Jersey law and New Jersey real estate. . . .
RRHC had an office in New Jersey, until recently. Hollin is
licensed to practice law in New Jersey. The legal services
centered on a loan transaction involving a residential
development in New Jersey, and obtaining first lien protection
for Plaintiff, Defendants' client. Plaintiff is alleging damages
based on actions and decisions which occurred in the Bankruptcy
Court in New Jersey . . . . In fact, the only substantial
Pennsylvania contacts in this case are that RRHC's principal
place of business is in Paoli, Pennsylvania and Hollin is also
licensed to practice in Pennsylvania and Defendants are
domiciled in Pennsylvania. But, these contacts do not rise to a
level which would require Pennsylvania law to govern this issue.
For these reasons, it is clear that New Jersey has the most
substantial interest in the claims. Moreover, nothing in the
analysis of the principles delineated in § 6 of the Restatement
rebuts the presumption that New Jersey has the most significant
interest in Plaintiff's claims.")(internal citations omitted);

Malkin v. Continental Cas. Co., No. 06-1103, 2010 WL 563066, at
*4 (D.N.J. Feb. 16, 2010)(legal malpractice claim arising out of
allegedly-conflicted representation of manager in securities
arbitration proceeding arising out of sale of investment in New
York has "most significant relationship" with New York, not New
Jersey, where "the arbitration claim was filed and awarded in
New York, the arbitrator applied New York law, and the
subsequent litigation involving the arbitration took place in
New York. The injury for which Mr. Malkin is seeking redress is
related to the damages arising from the New York arbitration
award and the Blackwell Defendants' representation of him in
that action. Thus both the injury and the conduct causing the
injury occurred in New York. Additionally, on the facts before
the Court, the relationship between the Missouri attorneys and
Mr. Malkin, a New Jersey resident, was centered around the
litigation occurring in New York. . . . [T]he only factor
weighing in favor of New Jersey is the mere fact of Mr. Malkin's
New Jersey residence and the fact that he has an office in New
Jersey. This is insufficient to outweigh the fact that the place
of injury and conduct occurred in New York"); Technology
Development Co. v. Onischenko, No. 05-4282, 2011 WL 6779552, at
*15 (D.N.J. Dec. 23, 2011)(ordering "parties to show cause why
Russian law should not apply" to breach of contract claim in
legal malpractice case where "Russia was apparently the place of

contracting, negotiation, performance, and subject matter of the alleged contract, with some performance also apparently occurring in Sweden and [plaintiff's] place of incorporation being Bermuda").

Although certain facts remain unclear (e.g., which jurisdiction's law the Cessna Settlement Agreement is governed by, or where exactly Mr. Anapol made the alleged misrepresentations to Plaintiff in the context of explaining the Cessna Settlement Agreement's provisions), the Court is ultimately persuaded that New Jersey has the most significant relationship with the occurrence and the parties.

Although the underlying litigation revolved around an accident in Arizona, and the Cessna Settlement Agreement may have been executed in Arizona, the instant dispute (about the soundness of the advice Defendant gave to Plaintiff, essentially) is sufficiently far removed from Arizona and its interests that, although it may appear to be facially close to these parties and occurrences, the Court does not believe it has a more significant interest than either Pennsylvania or New Jersey. This dispute, after all, is not about interpreting the settlement agreement but about the alleged breach of duties between attorney and client regarding plaintiff's acceptance of that agreement.

Addressing Pennsylvania's interests, they lie chiefly, here, in the regulation of attorneys whose primary place of business is Pennsylvania. This is the thrust of Defendant's argument. But such argument is undercut by the fact that not only was Mr. Anapol a licensed New Jersey lawyer at the time of his representation of Plaintiff, Defendant itself currently has a New Jersey office. [Docket Item 1 ¶ 6.] It would not be unreasonable to say that New Jersey shares Pennsylvania's interest in regulating the conduct of attorneys licensed to practice within it. The fact that the primary business location of Defendant is in Pennsylvania does not sufficiently undercut this fact to overcome the presumption that New Jersey law applies. While Mr. Anapol may have been practicing Pennsylvania law or Arizona law in connection with the Cessna Settlement Agreement, this does not mean that the relationship between Plaintiff and Mr. Anapol (or Defendant) was centered in Pennsylvania or Arizona. The breach of contract alleged by Plaintiff is not a breach of the Cessna Settlement Agreement, but rather a breach of the contract between Plaintiff and Defendant, which implicates their relationship rather than the settlement agreement negotiated as a result of that relationship.

The Court finds that the relationship between the parties-- which is the "cornerstone" of the analysis--was centered in New

Jersey. The Complaint alleges that Mr. Anapol knowingly reached out and into New Jersey to sign Plaintiff--a New Jersey resident--on as a client, via Plaintiff's brother, thereby beginning their relationship. Per the Complaint, Defendant communicated at all times with Plaintiff in New Jersey, and the alleged misrepresentation made by Mr. Anapol was made with knowledge that Plaintiff resided in New Jersey, and with the knowledge that the Cessna Settlement Agreement would affect Plaintiff's life in New Jersey. Furthermore, the Court finds that New Jersey's interests are strongly implicated where the instant matter will affect the provision of benefits to a New Jersey resident that were supposed to last a lifetime.

Accordingly, the Court finds that no other state has a more significant interest in this litigation sufficient to overcome the presumption that New Jersey substantive law applies. The Court therefore turns to Defendant's New-Jersey-law-based argument that the entire controversy Doctrine mandates that this action be dismissed.

"[T]he entire controversy doctrine constrains a plaintiff from withholding part of a controversy for separate litigation even when the withheld component is a separate and independently cognizable cause of action." Dowdell v. Univ. of Med. & Dentistry, 94 F. Supp. 2d 527, 534 (D.N.J. 2000)(citing Paramount Aviation Corp. v. Agusta, 178 F.3d 132, 137 (3d Cir.

1999). While the doctrine "mandates joinder of those claims arising from the same overall transaction involving the parties already named in the lawsuit[,]" Dowdell, 94 F. Supp. at 534 (internal quotations omitted), "the doctrine does not apply to unknown or unaccrued claims." DiTrolio v. Antiles, 142 N.J. 253, 273-74 (1995).

In finding that a second action should have been filed with the first action, the New Jersey Supreme Court upheld the ruling of a lower court that stated that "[t]he facts pleaded in the second complaint, although couched in terms designed to emphasize the alleged tortious conduct of the doctors [the defendants in the second case but not in the first], mirror the facts pleaded in the first complaint in all material aspects" and found that while the "plaintiff had ample opportunity to have fully litigated the claim [against the doctors] in the first action[,] he simply chose not to." Id. at 274.

Defendant argues that Plaintiff should have filed suit against it at the same time in 2014 that it sued "Cessna[;] First Lincoln Holdings, LLC, Underwriters at Lloyd's of London, and Doe Insurance Companies . . . involving the 1986 settlement agreement with Cessna. Furthermore . . . , Plaintiff was aware of a potential claim against Defendant Anapol Weiss well in advance of September 2014. Additionally, after Plaintiff's complaint [in the 2014 case] was dismissed on June 25, 2015, he

33

filed a Motion for Leave to Amend his Complaint on July 27, 2015" wherein he "could have alleged a cause of action against Anapol Weiss, but he failed to do so." [Docket Item 11-1 at 26.]

The Court disagrees that Plaintiff was required to file a legal malpractice claim against Defendant at the same time that he filed the 2014 lawsuit against Cessna et al. The Court agrees that "Plaintiff did not discover that the Defendant was the cause of his injury 'until the March 24, 2016 Order that dismissed his claims against Cessna that the Defendant advised him to bring.'" [Docket Item 16 at 14, citing Compl. ¶ 50.]

Furthermore, as Plaintiff points out, "the party-joinder requirements of the entire controversy doctrine do not extend to claims of attorney malpractice." [Docket Item 16 at 29, citing Olds, 150 N.J. at 428.] The New Jersey Supreme Court held, in 1997, that because administration of the entire controversy doctrine to attorney-malpractice actions would be overly difficult, it therefore "exempt[ed] all attorney-malpractice actions from the entire controversy doctrine" and "conclude[d] that the entire controversy doctrine no longer compels the assertion of a legal-malpractice claim in an underlying action that gives rise to the claim." Olds, 150 N.J. at 442-43.

Defendant argues that the policy justifications given in Olds (i.e., a concern for protecting an ongoing relationship between attorney and client) are inapplicable to this matter,

where there is no ongoing relationship between Plaintiff and Defendant. [Docket Item 18 at 15.] It further argues that it is not its contention that Plaintiff was required to join Defendant in the underlying litigation in Arizona, but rather in the 2014 litigation in the District of New Jersey. Id. at 15-16.

Again, the Court does not agree. First, the Court declines to second-guess the clear statement of the New Jersey Supreme Court in Olds and apply "the party-joinder requirements of the entire controversy doctrine" "to [a] claim[] of attorney malpractice." Olds, 150 N.J. at 428. Second, the Court finds that even if Olds did not bar such application, to the extent that this constitutes a successive suit, it is not subject to dismissal.

What is effectively the current New Jersey party-joinder rule states that a party must, at the time of the first pleading, "include . . . a certification . . . . [including] the names of any non-party who should be joined in the action pursuant to R. 4:28 or who is subject to joinder pursuant to R. 4:29-(1)(b) because of potential liability to any party on the basis of the same transactional facts." N.J.R.Ct. 4:5-1(b)(2). However, the rule also states that a "successive action shall not . . . be dismissed for failure of compliance with this rule unless the failure of compliance was inexcusable and the right of the undisclosed party to defend the successive action has

been substantially prejudiced by not having been identified in the prior action." Id.; see also Ricketti v. Barry, 775 F.3d 611, 614 (3d Cir. 2015)(recognizing that, "since 1998, automatic preclusion of a successive suit has not been the appropriate sanction in New Jersey for failure to join a defendant in an earlier action concerning the same subject matter").

The Court finds that Plaintiff's failure to name Defendant was neither inexcusable, nor has resulted in substantial prejudice to Defendant within the meaning of Rule 4:5-1(b)(2).

Plaintiff argues that its failure to name Defendant as a party in the 2014 lawsuit was not inexcusable because Plaintiff only filed the lawsuit on the advice of Defendant. [Docket Item 16 at 31-32.] The Court notes this and adds that it was, at least arguably, not clear to Plaintiff that Mr. Anapol's alleged statement that the payments were "guaranteed" was untrue (thereby rendering it a misrepresentation for our purposes) until Judge Bumb ruled that Plaintiff could not recover the balance of those payments from Cessna or another defendant in that action and dismissed Plaintiff's suit. For that reason, it seems a matter of logic that Plaintiff would not have had a reason to believe that Mr. Anapol's statement was a misrepresentation until such time as it became apparent that the payments were not, in fact, guaranteed; and without that misrepresentation, Plaintiff would likely not have been able to

state a claim here for legal malpractice at all. The New Jersey entire controversy does not require plaintiffs to assert claims that are premature or speculative. Under those circumstances, the Court concludes that the failure to include Anapol Weiss as a defendant for allegedly providing inaccurate advice to Plaintiff was not inexcusable where Plaintiff did not know, at the time he filed suit in 2014, that such advice was indeed inaccurate. Plaintiff makes this point [Docket Item 21 at 8-9, citing Compl. ¶ 47], and the Court finds it well-taken.

The Third Circuit has held that "substantial prejudice" under the Rule "requires a showing of more than mere inconvenience to the parties." Ricketti, 775 F.3d at 615 (noting precedents that held that even "the destruction of potentially relevant evidence before the filing of the successive action did not give rise to substantial prejudice")(citations omitted).

While Defendant may face difficulties in defending against this action due to passage of time, such difficulties do not constitute substantial prejudice within the meaning of Rule 4:5-1(b)(2). This is so especially because the greatest difficulty would appear, from the Court's perspective, to be the fact that Mr. Anapol passed away in 2012, and will not be able to provide his testimony regarding the settlement negotiations and what he did or did not represent to Plaintiff about the periodic payments being "guaranteed." However, the Court notes, this

difficulty would have been _equally present_ had Plaintiff filed his malpractice claim against Defendant in 2014, as Mr. Anapol had already passed away at that time.

Accordingly, the Court cannot conclude that Defendant suffers any special substantial prejudice as the Third Circuit has interpreted that requirement.

Without Plaintiff's failure having been inexcusable, and without substantial prejudice resulting from that failure, the Court finds that dismissal is not an appropriate sanction for any alleged failure of Plaintiff to join Defendant in the 2014 action under the entire controversy doctrine. Accordingly, the Court will deny Defendant's motion to dismiss on those grounds.

## V. CONCLUSION

For the foregoing reasons, the Court will deny Defendant's motion to dismiss as to the statute of limitations. The Court will also deny Defendant's motion to dismiss pursuant to the entire controversy doctrine under New Jersey law. The accompanying Order will be entered.


**March 29, 2018**                   **s/ Jerome B. Simandle**
DATE                                  JEROME B. SIMANDLE
                                        U.S. District Judge