IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ERIC YERKES                                            :
          *Plaintiff,*

                                     CIVIL ACTION
    v.                          :        NO. 17-2493[1]

ANAPOL WEISS
          *Defendant.*               :

## MEMORANDUM

**JONES, II    J.**                                        **April 22, 2022**

## I.  INTRODUCTION

      Mr. Paul Anapol and his law firm Anapol, Schwartz, Weiss, and Schwartz, P.C. (now called Anapol Weiss) was one of two law firms representing Plaintiff Eric Yerkes in a suit against Cessna Aircraft and Grand Canyon Airways.  Based on the settlement agreement from that case, Plaintiff commenced the instant litigation, alleging Defendant committed legal malpractice, Defendant was unjustly enriched, and Defendant breached its contract with Plaintiff. (ECF No. 1 at 10-12.)  Defendant has moved for summary judgment on all of Plaintiff's claims. (ECF No. 96 at 40.)  Plaintiff has in turn moved for partial summary judgment on the elements of duty and breach of standard of care for his legal malpractice claim only.  (ECF No. 103)  For the reasons set forth hereinbelow, Defendant's Motion for Summary Judgment shall be denied, and Plaintiff's Motion for Partial Summary Judgment shall be granted in part and denied in part.

---

[1] This matter was originally presided over by the late Honorable Jerome B. Simandle and was subsequently reassigned to the Honorable Noel L. Hillman in the United States District Court for the District of New Jersey until May 18, 2020, at which time the case was again reassigned to this Court. (ECF Nos. 83, 104.)

## II.  UNDISPUTED FACTS

### A.    Plaintiff Involved in Plane Crash and Retains Defendant as Counsel

On August 18, 1981, Plaintiff was involved in a plane crash near the Grand Canyon in Arizona.  (SUF ¶ 5; RSUF ¶ 5.)[2]  Cessna Aircraft Company (hereinafter "Cessna") manufactured the plane at issue, and Grand Canyon Airways was its operator.  (SUF ¶ 6; RSUF ¶ 6.)  At the time of the accident, Plaintiff was sixteen years old and resided at 65 White Birch Road in Turnersville, New Jersey.  (SOMF ¶ 1; RSOMF ¶ 1; SUF ¶ 7; RSUF ¶ 7.)  Plaintiff is and always has been a citizen of the state of New Jersey.  (SUF ¶ 2; RSUF ¶ 2.)

Shortly after the accident, Johnson Yerkes, Plaintiff's brother, received a call from the office of his dentist, Dr. Gerald Schwartz, who offered to put Johnson in touch with Defendant. (SOMF ¶ 5; RSMOF ¶ 5.)  After Dr. Schwartz's introduction, Johnson had a phone conversation with Defendant in September 1981. (SOMF ¶ 7; RSOMF ¶ 7.)  Johnson then retained Defendant to represent him in connection with the airplane incident.  (SOMF ¶ 13; RSOMF ¶ 13.) Plaintiff's parents also retained Paul Anapol on Plaintiff's behalf to bring claims against Cessna and Grand Canyon Airways.  (SUF ¶ 10; RSUF ¶ 10.)  Defendant charged Plaintiff a 40% contingent fee based on a written contingent fee agreement.[3]  (SOMF ¶ 32; RSOMF ¶ 32; SUF ¶

---

[2] For purposes of this discussion, the court shall refer to Defendant's Counterstatement of Material Facts (ECF No. 116 at 4) as "SOMF," Plaintiff's Response (ECF No. 119) thereto as "RSOMF," Plaintiff's Statement of Undisputed Material Facts (ECF No. 105-3) as "SUF," and Defendant's Response thereto (ECF No. 111) as "RSUF."

[3] Defendant denies the existence of a written contingent fee agreement. *See* RSUMF ¶ 13 (denying that "Defendant represented Plaintiff on a forty-percent (40%) contingency fee basis that was contained in a written contingency fee agreement").  Yet, Defendant concedes that it charged Plaintiff a 40% contingency fee.  *See* SOMF ¶ 32.  In 1983, a contingency fee agreement must have been "signed by both parties and . . . a signed duplicate [must] be given to the client." N.J. Cᴛ. R. 1:21-7(g) (as amended in 1978 – 1:21-7(g) was not amended until 1999); *see also Estates of Vafiades v. Sheppard Bus Services, Inc.*, 469 A.2d 971, 977 (N.J. Super. Ct. 1983) (applying this court rule).  Accordingly, there must have been a written and signed contingency fee agreement unless Defendant wishes to concede they violated a New Jersey Court rule.

13; RSUF ¶ 13.)  Defendant commenced suit on behalf of Plaintiff in the United States District

Court for the District of Arizona.  (SOMF ¶ 3; RSOMF ¶ 3.)  Plaintiff also retained Langerman,

Begam, Lewis and Marks, a law firm in Arizona, from the start of litigation.  (SOMF ¶ 4;

RSOMF ¶ 4); *see also Yerkes v. Cessna Aircraft Co., Inc.* No. CV-83-01616, (D. Ariz. Aug. 17,

1983), attached to Def.'s Reply Pl.'s Mot. Summ. J. as Exhibit A (ECF No. 116-1 at 288).

Plaintiff first met Paul Anapol at Defendant's office on Walnut Street in Philadelphia but

neither party knows the exact date of the meeting.  (SOMF ¶ 33; RSOMF ¶ 33.)  Plaintiff

attended Drexel University from 1983 to 1989 and lived on Drexel's campus "off and on" from

the fall of 1983 until early 1987.  (SOMF ¶ 37; RSOMF ¶ 37.)  Plaintiff ultimately settled his

case against Grand Canyon Airways in 1984.  (SOMF ¶ 38; RSOMF ¶ 38.)[4]

### B.   Cessna Settlement Agreement

Plaintiff lived in Philadelphia at the time of the Cessna settlement in early 1986.  (SOMF

¶ 39; RSOMF ¶ 39.)  Defendant presented Plaintiff with three structured settlement options.

(SUF ¶ 19; RSUF ¶ 19.)[5]  The three options varied in their length, number of payments, and total

---

[4] In 1984, Plaintiff entered into an agreement with Grand Canyon Airways regarding his claim against them in the Arizona lawsuit.  (SOMF ¶ 121; RSOMF ¶ 121.)  Pursuant to the agreement, Grand Canyon paid Plaintiff an immediate cash payment of $350,000.  (SOMF ¶ 122; RSOMF ¶ 122); *see also* Grand Canyon Agreement, Def.'s Mot. Summ. J. Exhibit F.  The agreement further provided if Plaintiff settled his claims with Cessna before trial, Plaintiff would keep the $350,000 from Grand Canyon, and Grand Canyon would contribute up to an additional $150,000 towards the settlement.  (SOMF ¶ 125; RSOMF ¶ 125; Def.'s Mot. Summ. J. Ex. F.)

[5] Although Defendant denies this fact—as well as several others—in its response to Plaintiff's Statement of Undisputed Material Facts, the court will consider these facts admitted for purposes of the pending motions.  Defendant failed to properly address Plaintiff's assertion of fact as required by the Federal Rules of Civil Procedure (hereinafter "FRCP") 56(c).  FRCP 56(c) states that assertions must be supported by "citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A).  Defendant also violated N.J. Local Rule 56.1(a) by not "citing to the affidavits and other documents submitted in connection with the motion."  This Court's approach is consistent with FRCP 56(e), which states "[i]f a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2).

payout.  (SOMF ¶ 66; RSOMF ¶ 66.)  In deciding between settlement structure options, Plaintiff

chose the one with the "greatest payout."  (SOMF ¶ 41; RSOMF ¶ 41.)  On February 15, 1986,

Plaintiff came to Defendant's office and signed the settlement documents.  (SUF ¶ 31; RSUF ¶

31.)  The settlement documents included a Release and Indemnity Agreement (ECF No. 116-7),

an Assignment Agreement (ECF No. 116-8), and a Recapitulation/Distribution statement (ECF

No. 116-9).

 In exchange for releasing his claims against Cessna and Cessna's insurers, Plaintiff

received a structured settlement consisting of an immediate cash payment and an annuity.

(SOMF ¶ 43; RSOMF ¶ 43.)  The immediate cash payment was $125,000.  (SOMF ¶ 44;

RSOMF ¶ 44.)  The annuity was expected to yield monthly payments of $1,000 for the duration

of Plaintiff's life.  Additionally, the annuity included eleven lump sum payments of increasing

amounts, paid at five-year intervals over the next fifty-five years.  (SOMF ¶ 45; RSOMF ¶ 45.)

The eleven lump sum payments were to be paid to either Plaintiff or Plaintiff's estate, regardless

of whether Plaintiff was still alive on the payment date.  (SOMF ¶ 46; RSOMF ¶ 46.)  The lump-

sum payment schedule is as follows:

> $25,000 payable in 5 years (February 1991), $40,000 payable in 10 years
> (February 1996), $70,000 payable in 15 years (February 2001), $125,000
> payable in 20 years (February 2006), $200,000 payable in 25 years
> (February 2011), $350,000 payable in 30 years (February 2016), $450,000
> payable in 35 years (February 2021), $600,000 payable in 40 years
> (February 2026), $900,000 payable in 45 years (February 2031),
> $1,200,000 payable in 50 years (February 2035), and $2,000,000 payable
> in 55 years (February 2041).

(SUF ¶ 30; RSUF ¶ 30.)

 The $1,000 monthly payments were to be paid to either Plaintiff or Plaintiff's estate for

twenty years.  (SOMF ¶ 47; RSOMF ¶ 47.)  After twenty years, these monthly payments would

only be made if Plaintiff was alive on the payment date.  (SOMF ¶ 48; RSOMF ¶ 48.)

On or about February 15, 1986, Plaintiff executed the settlement papers.  (SOMF ¶ 52; RSOMF ¶ 52.)  The annuity was purchased on or about February 18, 1986. (SOMF ¶ 53; RSOMF ¶ 53; Def.'s Mot. Summ. J. Ex. K.)  Both parties agree that Cessna and/or its insurers purchased the annuity from Executive Life Insurance Company of New York.  (SOMF ¶ 49; SOMF ¶ 49.)  The annuity contract issued by Executive Life of New York listed Plaintiff's address to be 65 White Birch Road, Turnersville, NJ 08012.  (SUF ¶ 34; RSUF ¶ 34); *see also* Pl's Resp. Ex. G.  Pursuant to an Assignment Agreement between Plaintiff and Cessna, Cessna assigned all its obligations in connection with periodic payments to First Executive Corporation ("FEC").  (SOMF ¶ 50; RSOMF ¶ 50.)  Also pursuant to the Assignment Agreement between Plaintiff and Cessna, Plaintiff released Cessna and its insurers from all obligations for the periodic payments.  (SOMF ¶ 51; RSOMF ¶ 51.)  Plaintiff has no recollection of reading or signing the Assignment Agreement.  (SOMF ¶ 133; RSOMF ¶ 133.)

The Release and Indemnity Agreement was executed and notarized on April 1, 1986. (SOMF ¶ 54; RSOMF ¶ 54; Def.'s Mot. Summ. J. Ex. G.)  Said Release and Indemnity Agreement provides in part:

> It is also understood and agreed that Cessna and Lloyds will assign their obligation for these periodic payments to First Executive Corporation as set forth in the Assignment Agreement. This assignment is accepted by Eric Yerkes, without right of rejection, in full release of Cessna and Lloyds with respect to these periodic payments. He acknowledges that once this assignment is made Cessna and Lloyds are released from the obligation to make such payments.

(SOMF ¶ 55; RSOMF ¶ 55; Def.'s Mot. Summ. J. Ex. G.)

The Release and Indemnity Agreement contains an attorney certification signed by Paul Anapol, which states "I, the undersigned, am the attorney for Eric Yerkes and have advised him regarding the release and have counseled him that by signing it and

accepting the considerations set forth, he is releasing any and all claim for unknown losses that may develop in the future."  (SOMF ¶ 56; RSOMF ¶ 56.)

Sol Weiss, current president and member of Anapol firm since 1977, testified that it was the practice of the firm at the conclusion of every case to prepare a Recapitulation / Distribution Statement that broke down the money paid in the settlement, the amounts taken out for attorneys' fees and expenses, and the amount the client would receive. (SOMF ¶¶ 99-100, 109; RSOMF ¶ 99-100, 109.)  The Recapitulation/Distribution Statement had to be signed by the client before the client would receive the proceeds of the settlement.  (SOMF ¶ 111; RSOMF ¶ 111.)

The Recapitulation/Distribution document for Eric Yerkes' settlement in 1986 was prepared by Defendant's assistant, Marci Strick.  (SOMF ¶ 117; RSOMF ¶ 117.) The Recapitulation/Distribution form stated, "All Periodic Payments Guaranteed To [Plaintiff] By The Cessna Aircraft Company Pursuant To The Release and Indemnity Agreement."  (SUF ¶ 47; RSUF ¶ 47; Pl's Resp. Ex. I.)  The Statement also noted "The Total Payout, Assuming a 59 Year Life-Expectancy is $6,668,000.00 of Which All but the Sum of $468,000 is Guaranteed by Cessna, its Insurers, and Assignees."  (SUF ¶ 48; RSUF ¶ 48; Pl's Resp. Ex. I.)  Although Plaintiff's signature is not on the Recapitulation/Distribution sheet, he was required to sign it to receive the lump sum cash portion of the settlement. (SOMF ¶ 112; RSOMF ¶ 112; SUF ¶ 49; RSUF ¶ 49.)

### C.    Defendant's Representation Throughout Cessna Settlement

Throughout Defendant's representation of Plaintiff, Plaintiff recalls meeting with Defendant approximately six times.  (SOMF ¶ 61; RSOMF ¶ 61.)  All of these meetings occurred either in Philadelphia or in Arizona.  (SOMF ¶ 62; RSOMF ¶ 62.)  Plaintiff is

certain that the last time he had a meeting with Defendant was in Philadelphia on February 15, 1986.  (SOMF ¶ 63; RSOMF ¶ 63.)  Prior to that meeting, Plaintiff met with Defendant in his Philadelphia office sometime in January 1986.  (SOMF ¶ 64; RSOMF ¶ 64.)  During the January 1986 meeting, Defendant presented Plaintiff with three options for a structured settlement, as offered by Cessna.  (SOMF ¶ 64; RSOMF ¶ 64.)  Plaintiff's brother, Johnson Yerkes, was present for the January 1986 meeting at Defendant's Philadelphia office.  (SOMF ¶ 65; RSOMF ¶ 65.)

Plaintiff testified he informed Defendant during that meeting he would not sign a settlement agreement spanning multiple decades because he "could not trust that an insurance company would be in business for the rest of [his] life."  (SUF ¶ 24; RSUF ¶ 24.)  Plaintiff further testified that Defendant assured him the structured settlement was guaranteed by Cessna and guaranteed and backed by the state of New York.  (SUF ¶ 25; RSUF ¶ 25; SOMF ¶ 72; RSOMF ¶ 72.)  Plaintiff asserted Defendant also said "those payments would be made no matter what.  If the insurance company didn't pay it, Cessna would pay it . . . [e]ither Cessna would pay it or their re-insurers would pay it." (SUF ¶ 27; RSUF ¶ 27.)  Johnson Yerkes, also present at the meeting, testified that he remembers Defendant saying, "I think this is in your best interest, in the long run, you'll make more money, you're guaranteed for life, and this'll take care of you, because when you get older you can have serious complications from the accident."  (SOMF ¶ 75; RSOMF ¶ 75.)  Johnson Yerkes had no recollection of Plaintiff saying he didn't trust an insurance company to be in business for fifty-five years.  (SOMF ¶ 83; RSOMF ¶ 83.)  June Yerkes, Plaintiff's mother, was present for part of one meeting with Defendant, Plaintiff,

and Johnson but only recalls that there was discussion about how "Lloyds of London was a good thing or something like that." (SOMF ¶¶ 84, 86; RSOMF ¶¶ 84, 86.)

Joel Feldman is a current shareholder of the Anapol firm. (SOMF ¶ 87; RSOMF ¶ 87.) In the late 1980s, Joel Feldman was an associate of the firm. (SOMF ¶ 88; RSOMF ¶ 88.) From 1982 to 1988, Joel Feldman was the only associate that worked with Paul Anapol, although he was not directly involved in Plaintiff's case. (SOMF ¶¶ 89-90; RSOMF ¶¶ 89-90.) Feldman said it was Paul Anapol's practice to retain an independent expert to review the proposed structure settlement. (SOMF ¶ 93; RSOMF ¶ 93.) He further testified it was Paul Anapol's practice to retain an economic consultant with expertise in structured settlements to evaluate the structured settlement options offered to Paul Anapol's clients. (SOMF ¶ 94; RSOMF ¶ 94.)

Joel Feldman stated that it was Paul Anapol's practice to rely on the expert, as opposed to independently investigating the proposed insurance company issuing the annuity. (SOMF ¶ 95; RSOMF ¶ 95.) He claimed Paul Anapol taught him that the term "guarantee"—as it is used in the context of structured settlements—referred to a mortality guarantee, which addressed whether payments would continue to be made after the payee's death. (SOMF ¶ 96; RSOMF ¶ 96.) Joel Feldman also testified that part of the expert's consultation would be confirming the life insurance carrier from which Paul Anapol was purchasing the annuity was highly rated by national rating agencies. (SOMF ¶ 148; RSOMF ¶ 148.) In and around 1986, Executive Life Insurance Company of New York and its parent, First Executive Corporation, had the highest possible ratings from rating agency, A.M. Best. (SOMF ¶ 149; RSOMF ¶ 149.) In Plaintiff's case, the

Recapitulation / Distribution Statement showed a $460 expense for "Legal Economic Evaluations."  (SOMF ¶ 147; RSOMF ¶ 147.)

Sol Weiss is the current president and managing shareholder of the Anapol firm. (SOMF ¶ 99; RSOMF ¶ 99.)  He has been a member of the firm since 1977 and a manager of the firm since the mid-1980s.  (SOMF ¶ 100; RSOMF ¶ 100.)  Weiss testified as a corporate designee that it was the practice of the firm to rely on an economic expert consultant to "validate, verify, and offer some advice" regarding the structured settlements offered by a defendant to their clients.  (SOMF ¶ 103; RSOMF ¶ 103.)

It is also the policy of Defendant to retain paper files for seven years before destroying them.  (SOMF ¶ 97; RSOMF ¶ 97.)  When Plaintiff first contacted the firm about the reduction of his payments in 2012, a search confirmed no file existed from his 1986 case.  (SOMF ¶ 98; RSOMF ¶ 98.)

### D.     ELNY Insolvency and Plaintiff Sues Cessna

From 1986 to 2013, Plaintiff received all his monthly and five-year periodic payments from ELNY in full, as scheduled.  (SOMF ¶ 57; RSOMF ¶ 57.)  In December 2011, Plaintiff was notified that ELNY and its parent company were insolvent and in liquidation, and that his payments under this structured settlement annuity were anticipated to be reduced.  (SOMF ¶ 58; RSOMF ¶ 58.)  As a result of the liquidation and restructuring of ELNY, Plaintiff's annuity payments were reduced by 56.4%, beginning with the August 2013 payment.  (SOMF ¶ 59; RSOMF ¶ 59.)  Plaintiff continues to receive monthly payments and lump sums as scheduled, in the reduced amount, from the Guaranty Association Benefits Company "GABC," the successor of the New York Guaranty Association.  (SOMF ¶ 60; RSOMF ¶ 60.)

Prior to initiation of this case, Plaintiff sued Cessna and its insurer, Lloyds of London, for breach of contract arising out of the insolvency of ELNY.  (SOMF ¶ 136; RSOMF ¶ 136.)  In the matter of *Eric Nels Yerkes v. Cessna Aircraft Co.*, No. 14-cv-05925 (D.N.J.), the Honorable Renee Marie Bumb entered a dispositive Order and Opinion dismissing Plaintiff's claims.  (SOMF ¶ 137; RSOMF ¶ 137; Def.'s Mot. Summ. J. Ex. J.)  Judge Bumb held that all of Cessna and its insurers' obligations for payments under the Release and Indemnity Agreement were validly assigned to ELNY pursuant to the Release and Indemnity Agreement and the Assignment Agreement.  (SOMF ¶ 141; RSOMF ¶ 141; Def.'s Mot. Summ. J. Ex. J.)  Judge Bumb wrote "the Court is hard-pressed to see how Plaintiff could not have known of the circumstances underlying the allegedly improper assignment at the time of the settlement.  (SOMF ¶ 142; RSOMF ¶ 141; Def.'s Mot. Summ. J. Ex. J at 4.) Judge Bumb stated that the Release and Indemnity Agreement and the Assignment Agreement "clearly and unambiguously demonstrate that [Cessna] fulfilled their contractual obligations by making a lump-sum payment, purchasing an annuity and assigning it to FEC."  (SOMF ¶ 143; RSOMF ¶ 143; Def.'s Mot. Summ. J. Ex. J. at 4.)

### III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a).  "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific

facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted). Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both: (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001) (quoting *Celotex*, 477 U.S. at 325). "[A] nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings[.]" *Williams v. West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citation omitted). Accordingly, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To that end, however, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002)) (internal quotation marks omitted). Instead, an affiant must set forth specific facts that reveal a genuine issue of material fact. *Id*.

A court must "view the facts and any reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment." *InterVest, Inc. v. Bloomberg, L.P.*,

340 F.3d 144, 160 (3d Cir. 2003).  However, if a party fails to properly address another party's

assertion of fact, a court may consider the fact undisputed and grant summary judgment.  Fed. R.

Civ. P. 56(e)(2)-(3).

## IV.    DISCUSSION

Defendant has moved for summary judgment on all of Plaintiff's claims, and Plaintiff has

moved for partial summary judgment on the elements of duty and breach for his legal

malpractice claim.[6]  In support of its motion, Defendant raises several arguments: (1)

Pennsylvania law should apply, and its statute of limitations should preclude Plaintiff's claim

from proceeding; (2) New Jersey's collateral estoppel doctrine prevents Plaintiff from arguing

that he did not understand the terms of the Cessna Settlement Agreement; (3) if New Jersey law

applies, its Dead Man Statute should require Plaintiff to establish his legal malpractice claim by

clear and convincing evidence; and, (4) Paul Anapol met the accepted standards of practice when

advising Plaintiff on his 1986 structured settlement with Cessna.  (Def.'s Mot. Summ. J. 16, 18,

30, 33.)  For the reasons set forth below, this Court finds Plaintiff's legal malpractice claim shall

not be precluded and there is a genuine dispute of material fact regarding whether Defendant

breached its standard of care.  Accordingly, Defendant's Motion for Summary Judgment shall be

denied, and Plaintiff's Motion for Partial Summary Judgment shall be granted on the element of

duty but denied on the element of breach for his legal malpractice claim.

---

[6] Although Defendant requested Summary Judgment on all of Plaintiff's claims, Defendant did
not argue or brief Plaintiff's claims of breach of contract or unjust enrichment.  (Def's Mot.
Summ. J. 40.) Because Defendant has not met its burden of showing the absence of any genuine
dispute of material fact with respect to any element of these two claims, its motion regarding
same must be denied.  Fed. R. Civ. P. 56(a); *see also Duran v. Equifirst Corp*., No. 2:09-cv-
03856, 2010 U.S. Dist. Lexis 22903, at *3 (D.N.J. Mar. 12, 2010) (noting the "absence of
argument constitutes waiver in regard to the issues left unaddressed.").

### A.      Choice of Law & Statute of Limitations

Defendant first asks this Court to declare that Pennsylvania law applies to this case, thereby precluding suit based on Pennsylvania's statute of limitations.  (Def.'s Mot. Summ. J. 33.)  Defendant raised a similar argument in its Motion to Dismiss, which the late Honorable Jerome B. Simandle rejected.  In the Opinion denying Defendant's Motion to Dismiss, Judge Simandle applied § 142 of the Second Restatement of Conflicts of Law under New Jersey Law to determine which states' statute of limitations should apply.  (ECF No. 37 at 11-13).  Judge Simandle wrote that the court first must assess whether New Jersey has a "substantial interest" in the litigation.  (ECF No. 37 at 13.)  Because Plaintiff is and always has been a resident of New Jersey, Plaintiff suffered the alleged harm in New Jersey, and the funds at issue here were to secure Plaintiff's well-being in New Jersey, the [c]ourt had "little difficulty in concluding that New Jersey has such an interest."  (ECF No. 37 at 13.)  After finding that New Jersey has a "substantial interest" in the litigation and failing to discern "exceptional circumstances," Judge Simandle found that New Jersey's statute of limitations applied. (ECF No. 37 at 14.)

Like in its Motion to Dismiss, Defendant again relies on Comment g of § 142 of the Second Restatement, which provides an exception to the "substantial interest" determination. Comment g states: "where the domicil[e] of the plaintiff is in the state of the forum and that of the defendant is in the other state with the most significant relationship to important issues in the case[,] ... the forum should entertain the claim only in extreme and unusual circumstances." *Restatement (Second) of Conflicts of Law* § 142, cmt. g (1998).  Although Judge Simandle addressed and rejected this argument, Defendant now argues that Judge Simandle had to assume as true certain facts that have been subsequently proven false based on discovery.  (Def.'s Mot. Summ. J. 35.)  Such facts include: (1) Paul Anapol was licensed in New Jersey; (2) Paul Anapol

solicited Plaintiff's business in New Jersey; (3) Paul Anapol transacted business in New Jersey; and, (4) Plaintiff lived in New Jersey at the time of the litigation. (Def.'s Mot. Summ. J. 35-36.) Despite Defendant's argument that all these facts have been proven false, the record only reveals the truth of two: Paul Anapol was not licensed in New Jersey and Plaintiff lived in Philadelphia at the time of the suit. As further explained below, these new facts do not change Judge Simandle's original conclusion that New Jersey has a substantial interest in applying its statute of limitations to this case.

In further support of its argument, Defendant cites *MTK Food Services Inc. v. Sirius American Ins. Co*., 189 A.3d 914 (N.J. Super. Ct. App. Div. 2018); *see also* Def.'s Mot. Summ. J. 36. In *MTK*, the plaintiff owned a business in Pennsylvania and hired a New Jersey attorney to pursue an insurance claim against Plaintiff's insurers. *Id*. at 915-916. The New Jersey court performed a choice of law analysis to determine the governing statute of limitations because Plaintiff filed its suit beyond Pennsylvania's two-year statute of limitations but within New Jersey's six-year statute of limitations. *Id.* at 917. The court held that Pennsylvania's statute of limitations applied because New Jersey did not have a substantial interest in the case, as an attorney licensed and working in New Jersey fell short of establishing a "substantial interest." *Id.* at 918.

This Court concludes *MTK*'s ultimate holding does not change Judge Simandle's finding that New Jersey law applies. Read broadly, *MTK* stands for the proposition that the citizenship of the Plaintiff and location of injury provides a state substantial interest to apply its statute of limitations. Both parties agree that Plaintiff is and always has been a citizen of the state of New Jersey. (SUF ¶ 2; RSUF ¶ 2.) The annuity payments from the settlement agreement were intended to provide Plaintiff a lifetime benefit in New Jersey. (ECF No. 37 at 32.) The alleged

harm from Defendant's legal malpractice was suffered in New Jersey.  Therefore, under *MTK*'s reasoning, New Jersey has a substantial interest in applying its statute of limitations.  Moreover, Defendant's argument about Pennsylvania's interest in regulating the conduct of Pennsylvania attorneys is equally unpersuasive because *MTK* ruled that this reason alone is insufficient to find substantial interest.  *Id.* at 919 ("That [Plaintiff] sought assistance from an attorney, who holds a New Jersey License and works in New Jersey, bears no relation to the malpractice allegation and should not change the outcome here.").

The court agrees with Judge Simandle's conclusion that "no other state has a more significant interest in this litigation to overcome the presumption that New Jersey Law applies." (ECF No. 37 at 32.)  Judge Simandle reasoned "New Jersey's interests are significantly implicated where the instant matter will affect the provisions of benefits to a New Jersey resident that were supposed to last a lifetime."  (ECF No. 37 at 32.)  Moreover, the New Jersey Supreme Court issued a clear statement in *McCarell v. Hoffmann-La Roche, Inc.* that "[f]or all practical purposes, under § 142, once a court finds that the forum state has a substantial interest in the litigation, the inquiry is at an end."  153 A.3d 207, 224 (N.J. 2017); (ECF No. 37 at 14.) Notwithstanding Pennsylvania's interest in the lawsuit, New Jersey clearly has a substantial interest in the litigation that affects the lifetime benefits of a New Jersey resident.  Accordingly, this Court holds that New Jersey law including its statute of limitations applies to this case.

New Jersey's statute of limitations for legal malpractice and contract actions is six years. N.J. STAT. ANN. § 2A:14-1.  The New Jersey Supreme Court has ruled that the statute of limitations does not begin to run until the client suffers actual damage.  *Vastano v. Algeier*, 837 A.2d 1081, 1084 (N.J. 2003) (citing *Grunwald v. Bronkesh*, 621 A.2d 459, 459 (N.J. 1993)). Plaintiff did not suffer actual damages until August 8, 2013, when his periodic payments were

reduced.  (SOF ¶ 19; RSOF ¶ 19.)  Because Plaintiff filed this suit on April 12, 2017, he timely

filed within New Jersey's six-year statute of limitations.

### B.    Collateral Estoppel

Defendant next argues that collateral estoppel should preclude Plaintiff from arguing he

did not understand the terms of the agreement.  (Def.'s Mot. Summ. J. 30-33.)  As the New

Jersey Supreme Court explained in *In Re Dawson*, the party asserting a collateral estoppel bar

must show:

> (1) The issue to be precluded is identical to the issue decided in the previous
> proceeding . . . (2) the issue was actually litigated in the prior action . . . [i.e.,
> there was a full and fair opportunity to litigate the issue in the prior action]; (3)
> the court in the prior proceeding issued a final judgment on the merits; (4) the
> determination of the issue was essential to prior judgment . . . ; and (5) the party
> against whom the doctrine is asserted was a party to or in privity with a party to
> the earlier proceeding.

641 A.2d 1026, 1034-35 (N.J. 1994.)

Defendant argues the dismissal of Plaintiff's suit against Cessna demonstrates Plaintiff

must have understood the settlement agreement, which released Cessna from all legal obligations

to make the structured settlement payments.  (Def.'s Mot. Summ. J. 32-33.)  Specifically,

Defendant relies on Judge Bumb's statement that "the Court is hard-pressed to see how Plaintiff

could not have known of the circumstances underlying the allegedly improper assignment at the

time of the settlement."  (Def.'s Mot. Summ. J. 32 Ex. J at 4.)

In opposition, Plaintiff argues he cannot be estopped from claiming his attorney told him

the settlement was guaranteed by Cessna, notwithstanding terms to the contrary in the settlement

document.  (Pl's Reply 32.)  In support of his position, Plaintiff relies on *Ziegelheim v. Apollo*,

607 A.2d 1298 (N.J. 1992).   In *Ziegelheim*, the plaintiff filed a legal malpractice suit against her

attorney who represented her in a divorce settlement with her ex-husband.  *Id.* at 1299.

Defendant negotiated a divorce settlement that the family court determined was "fair and equitable." *Id.* at 1305. Still, Plaintiff filed suit alleging Defendant was negligent, despite stating in court that she "understood the agreement, thought it was fair, and entered into it voluntarily." *Id.* at 1301. In holding that collateral estoppel did not bar Plaintiff's legal malpractice claim, the court wrote "[t]he fact that a party received a settlement that was 'fair and equitable' does not mean necessarily that the party's attorney was competent or that the party would not have received a more favorable settlement had the party's incompetent attorney been competent." *Id.* at 1305.

Defendant argues the instant matter is distinguishable from *Ziegelheim* because the District Court of New Jersey already rendered a thorough opinion on the issue of whether Plaintiff accepted and understood the agreement. This distinction is not determinative, however. The principle underlying *Ziegelheim* is that a previous judicial ruling that a party understood a settlement agreement does not preclude a legal malpractice claim. Moreover, the issue in Plaintiff's previous case against Cessna is not the identical issue raised here. Here, Plaintiff alleges that Defendant misrepresented the terms of the agreement, and that Plaintiff suffered an injury based on Defendant's misrepresentation. Plaintiff did not raise this argument in the earlier proceedings, so the issue is not "*identical* to the issue decided in the previous proceeding." *Dawson*, 641 A.2d at 641 A.2d 1034-35 (emphasis added). Accordingly, this Court concludes collateral estoppel shall not preclude Plaintiff's legal malpractice claim from going forward.

(C)   **New Jersey's Dead Man Statute**

Defendant next argues New Jersey's Dead Man Statute should apply to Plaintiff's claim. (Def.'s Mot. Summ. J. 16.) Because Paul Anapol passed away before this case commenced,

Defendant contends the statute applies and requires plaintiffs to prove their case by clear and convincing evidence.  (Def.'s Mot. Summ. J. 16-17).  New Jersey's Dead Man Statute provides:

> In a civil action that is commenced or defended by a guardian on behalf of a person who is mentally incapacitated or by a personal representative on behalf of a decedent, any other party who asserts a claim or an affirmative defense against the person who is mentally incapacitated or against the personal representative, that is supported by oral testimony of a promise, statement, or act of the person who is mentally incapacitated before the onset of mental incapacity, or of the decedent, shall be required to establish the same by clear and convincing proof.

N.J. STAT. ANN. § 2A:81-2.

The clear and convincing standard of proof applies "in all cases where the claim against the *decedent's* <u>*estate*</u> depends at least in part upon the truth of oral testimony of the promises or acts of decedent, even when written evidence has also been introduced."  *Moran v. Estate of Pellegrino*, 216 A.2d 406, 408 (N.J. Super. Ct. App. Div. 1966) (emphasis added).[7]  The New Jersey Supreme Court later clarified the scope of the Dead Man's Act, noting that if a decedent's estate is not affected by the outcome, the statute does not apply.  *See Germann v. Matriss*, 260 A.2d 825, 835 (N.J. 1970).  Because Plaintiff is asserting a claim against the law firm—rather than Paul Anapol, his personal representative, or his estate—the statute does not apply here.

In addition to the foregoing, other considerations weigh against applying New Jersey's Dead Man's Statute to Plaintiff's legal malpractice claim.  In *Germann*, the Court narrowly

---

[7] In the matter of *Chance v. Mcann*, the court declined to follow the holding in *Moran*.  966 A.2d 29, 46 (N.J. Super. Ct. App. Div. 2009).  In *Chance*, the appellate court reversed part of the jury's verdict because the trial court instructed the jury, pursuant to New Jersey's Dead Man Statute, that Plaintiffs had to prove their case by clear and convincing evidence.  *Id.*  The appellate court found the statute inapplicable in this case and reasoned that "*Moran* states too categorical an interpretation."  *Id.*  The court re-emphasized that the purpose of the statute was "to prevent false claims made against an estate."  *Id.* at 47. Because Plaintiff does not assert a claim against Paul Anapol, his personal representative, or his estate, the statute is not applicable here.

interpreted the Dead Man's Act and specifically held "any doubt as to whether [the Dead Man's Act] applies to vehicle or dental malpractice negligence actions, should be resolved against its application." 260 A.2d at 840. New Jersey Courts have applied the higher standard of proof only "in certain limited legal malpractice claims." *Pivnick v. Beck*, 741 A.2d 655, 665 (N.J. Super. Ct. App. Div. 1999). In *Pivnick*, the plaintiff brought a legal malpractice claim against an attorney, alleging he negligently drafted his father's revocable trust agreement directly contrary to his father's will. 741 A.2d at 657. The court ruled this heightened standard applied because the plaintiff's allegations directly contradicted a formal trust agreement, and the court "cannot and will not trivialize the sanctity of such documents." *Id.* at 665.[8] Such concerns are not present here. All parties agree on the legal obligations resulting from the release and indemnity agreement and assignment agreement. Plaintiff does not seek to contradict the terms of the agreement. Instead, Plaintiff alleges that Defendant's lawyer misrepresented the terms.

Given Plaintiff's assertion of his claim against the law firm, the narrow construction of New Jersey's Dead Man Statute, and Defendant's misplaced reliance on *Pivnick*, this Court holds that New Jersey's Dead Man Statue does not apply and does not require Plaintiff to prove his legal malpractice claim by clear and convincing evidence.

### D.   Legal Malpractice Claim

Plaintiff has asked this Court to grant partial summary judgment on the elements of duty and breach for his legal malpractice claim. (Pl's Mot. Partial Summ. J. 1.) Plaintiff argues Defendant misrepresented the nature of the settlement agreement in the Recapitulation / Distribution Statement, which constitutes a breach of the reasonable standard of care. (Pl's Mot.

---

[8] This Court further notes that *Pivnick* involved claims regarding an estate, whereas the instant matter does not.

Partial Summ J. 12.)  Defendant has also moved for summary judgment on Plaintiff's entire legal malpractice claim, arguing Plaintiff presented insufficient evidence of Defendant's breach. (Def's Mot. Summ. J. 22, 40.) Defendant further argues Plaintiff failed to show proximate cause because the "sole evidence of record regarding proximate causation is Plaintiff's allegation that he would not have accepted the settlement but for alleged oral assurances from Paul Anapol that payments were 'guaranteed' by Cessna." (Def's Mot. Summ. J. 28.)

In New Jersey, the following elements are necessary to establish legal malpractice: " (1) the existence of an attorney-client relationship giving rise to a duty of care; (2) breach of that duty by the attorney; (3) that the breach was the proximate cause of any damages sustained; and (4) actual damages." *Wills, O'Neill & Mellk v. Rothman*, Civil Action No. 10-3078, 2012 U.S. Dist. LEXIS 68370, at *17-18 (D. N.J. May 16, 2012) (citing *McGrogan v. Till*, 771 A.2d 1187, 1193 (N.J. 2001)).  To survive summary judgment for a legal malpractice claim, a plaintiff must show that competent, credible evidence existed to support each element of the negligence action. *Cortez v. Gindhart*, 90 A.3d 653, 658 (N.J. Super. Ct. App. Div. 2014).  In assessing same, a preponderance of the evidence standard is utilized.  *Wills, O'Neill & Mellk*, 2012 U.S. Dist. LEXIS 68370, at *17-18.

### (1) Duty

Neither party contests the existence of an attorney-client relationship between Plaintiff and Defendant.  Therefore, the attorney-client relationship created a duty of care and Plaintiff's Partial Motion for Summary Judgment is granted on the element of duty for his legal malpractice claim.

20

**(2) Breach**

Plaintiff argues three theories for Defendant's breach of the standard of care. (1) Defendant failed to obtain a means of protecting Plaintiff in the event ELNY became insolvent— a concern Plaintiff claims he raised several times before settlement; (2) Defendant did not provide complete and accurate information about the structured settlement; and, (3) Defendant communicated misleading information that left Plaintiff with the impression the periodic payments were guaranteed by Cessna, its insurers, and also guaranteed by the State of New York. (Pl's Resp. Mot. Summ. J. 20.) In response to Plaintiff's first argument, Defendant contends Plaintiff's expert testimony is too theoretical, and his suggested methods of securing the settlement through a surety bond or another instrument would not have been feasible. (Def's Reply 3.) Defendant further addresses Plaintiff's second and third arguments by asserting there is not sufficient evidence to create a genuine dispute of material fact on whether Defendant misrepresented the terms of the Cessna agreement to Plaintiff.

In its motion, Defendant argues that Paul Anapol comported with the standard of care. (Def's Mot. Summ. J. 18.) Defendant presents evidence that Paul Anapol hired an independent economic expert to evaluate the structured settlement. (Def's Mot. Summ. J. 19.). Because Defendant took this step, it contends it complied with the model ABA standards, although such standards did not exist until four years after the settlement. (Def's Mot. Summ. J. 19.) Defendant finally argues that all relevant testimony about the patterns and practice of Paul Anapol demonstrate he would not misrepresent the settlement to a client. (Def's Mot. Summ. J. 28.) This Court shall address each argument in turn.

### (a) Standard of Care

"[T]he Plaintiff in a legal malpractice claim bears the burden to establish the appropriate standard of care with expert evidence."  *Scott v. Calpin*, 527 F. App'x 123, 126 (3d Cir. 2013). Although "credibility determinations on material issues cannot be made in the context of a motion for summary judgment," New Jersey courts apply the net opinion rule to evaluate the admissibility of expert testimony for purposes of a summary judgment motion.  *Kitt v. United States*, 756 F. App'x 114, 115 (3d Cir. Nov. 26, 2018) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993)); *see also Davis v. Brickman Landscaping, Ltd.*, 98 A.3d 1173, 1181 (N.J. 2014) (applying the net opinion rule in the context of a motion for summary judgment to determine the admissibility of an expert's testimony establishing the standard of care in a negligence action).  The New Jersey net opinion rule provides . . .

> An expert may not provide an opinion at trial that constitutes mere net opinion. The rule prohibiting net opinions is a corollary of New Jersey Rule of Evidence 703, which provides an expert's testimony may be based on facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts in forming opinions on the same subject. Thus, the net opinion rule can be considered a restatement of the established rule that an expert's bare conclusions, unsupported by factual evidence, are inadmissible. The net opinion rule requires the expert to give the why and wherefore that supports the opinion, rather than a mere conclusion . . . Therefore, an expert offers an inadmissible net opinion if he or she cannot offer objective support for his or her opinions, but testifies only to a view about a standard that is personal.

*Davis*, 98 A.3d at 1181 (internal citations omitted).

Here, Plaintiff and Defendant each retained an expert witness who described a different standard of care. On the one hand, Defendant's expert, Scott Piekarsky, opined that Defendant complied with accepted standards of practice in representing Plaintiff and advising Plaintiff on

the Cessna settlement.  (Def's Mot. Summ. J. Ex. L. 10.)  Mr. Piekarsky noted that Defendant's conduct complied with ABA standards for handling structured settlement, although these standards were "non-existent when the settlement was signed in 1986."  (Def's Mot. Summ. J. Ex. L 10.)  Although these standards were approved four years after the settlement, Mr. Piekarsky noted how the model standards primarily required attorneys to ensure the annuity accepted by their client was from an insurance company with the highest rating from independent agencies.  (Def's Mot. Summ. J. Ex. L. 10-11.)  It is undisputed that around 1986, Executive Life Insurance Company of New York and its parent, First Executive Corporation, had the highest possible ratings from rating agency A.M. Best.[9]  (SOMF ¶ 149; RSOMF ¶ 149.)  Furthermore, there is evidence that Paul Anapol retained an independent economic expert to evaluate the structured settlement based on testimony regarding his pattern of practice and the $460 expense for "legal economic evaluations" in the Recapitulation/Distribution statement. (SOMF ¶¶ 95, 147; RSOMF ¶¶ 95, 147.)[10]

On the other hand, Plaintiff's expert, Bennett J. Wasserman, opined that the standard of care in 1986 for structured settlements required attorneys to provide a measure of security for their client because of its horizontal structure and decades-long payments.  (Pl's Resp. Ex. K 20,

---

[9] The rating agency A.M. Best was often used in structured settlements at that time. *See, e.g.*, *Keller v. Dougherty*, 484 A.2d 1327, 1329 (N.J. Super. Ct. 1984) (producing a copy of a settlement negotiation letter that stated A.M. Best rated the insurance company underwriting the annuity as an "A"); *Bambi v. Dr. O*, 482 A.2d 536, 537 (N.J. Super. Ct. 1984) (noting with approval that A.M. Best rated insurance companies who were responsible for paying out annuity in structured settlement A or A+); *A v. D*, 482 A.2d 531, 533 (N.J. Super. Ct. 1984) ("The underwriter is the Manufacturers Life Insurance Company, which is rated A+ (the highest rating) by A.M. Best Company.").

[10] This Court recognizes that "legal economic evaluations" do not necessarily establish that Defendant hired an expert at the time, particularly at that price. Instead, the fee was most likely paid in exchange for a "present value report," which is "a letter on the transaction" prepared by an economic consultant and did "not include legal or tax advice."  (Pl's Resp. Ex. K 13, ECF No. 105-15 at 28.)

n.94.)  Such protections could be secured through several mechanisms, including other life

insurance companies guaranteeing these transaction.  (Pl's Resp. Ex. K 21, n.96.)  Wasserman

stated in his report that the fact Defendant hired an economic consultant was not sufficient to

meet the standard of care because it was reasonable to conclude that said consultant limited its

review to the value of the annuity and did not review ELNY's financial strength.  (Pl's Resp. Ex.

K 21.)[11]  Plaintiff's expert also relied on Sol Weiss's deposition where he failed to articulate any

disadvantages of structured settlements and concluded that clients were generally not counseled

on the disadvantages and risks of such settlements based on this testimony.  (Pl's Resp. Ex. K 8.)

Ultimately, Plaintiff's expert concluded that Defendant had a heightened duty to provide

protection for a client's lifetime benefits in a structured settlement because of the client's

insistence on another entity guaranteeing these benefits.  (Pl's Resp. Ex. K 20.)[12]  Thus,

Plaintiff's expert concluded that Defendant fell below the appropriate standard of care by failing

to provide such protection.[13]

     Because each expert witness provided a sufficient factual basis to support their

conclusions and explain their methodologies, the court holds both opinions pass the net opinion

---

[11] In fact, Plaintiff's expert cited to the deposition testimony of Mr. Paul Lesti, a former
employee of Legal Economic Evaluations ("LEE")—the company Defendant used to assess
Plaintiff's structured settlement.  Mr. Lesti testified that LEE would conduct a document review
of a case to confirm the proposed settlement included sufficient damages for the injuries
sustained.  Notably, "LEE did not evaluate the viability of insurers in connection with evaluating
structured settlements, nor, in Lesti's recollection, did it compare alternative values offered by
different insurers."  (Pl's Resp. Ex. K 13, ECF No. 105-15 at 24.)

[12] Plaintiff's expert counters Defendant's argument that New York Guarantee sufficiently backed
such benefits because it was "universally understood when state guaranty funds become
involved, the beneficiary often gets pennies on the dollar . . . ." (Pl's Resp. Ex. K 22.)

[13] Plaintiff's expert further asserts that Defendant's failure to insulate Plaintiff from ELNY's
insolvency and Defendant's misleading communication also constituted breaches of standard of
care. (Pl's Resp. Ex. K. 22-27.)  He notes that the Recapitulation/Distribution Statement violated
RPC 1.4 and the duty of communication to a client. (Pl's Resp. Ex. K. 25.)

rule.  Plaintiff's expert relied on written treaties, evidence of record, and the nature of the

settlement to determine the standard of care owed to Plaintiff in 1986.  (Pl's Resp. Ex. K 8, 20-

21.)  Likewise, Defendant's expert relied on ABA model standards, model rules of professional

conduct, and industry practices to explain the appropriate standard of care.  (Def's Mot. Summ.

J. Ex. L 10-13.).  Since neither expert relied on speculative opinions or personal views

unfounded in the record, this Court holds there exists a genuine dispute of material fact as to

whether Defendant breached its duty of care by failing to protect Plaintiff's structured settlement.

> **(b) Whether Defendant Breached its Standard of Care by**
> **Misrepresenting or Providing Incomplete Information**
> **about Cessna Settlement**

The New Jersey Supreme Court has articulated the ordinary standard of care for attorneys

rendering services on behalf of clients:

> "Ordinarily when an attorney engages in the practice of the law
> and contracts to prosecute an action [on] behalf of his client, he
> impliedly represents that (1) he possesses the requisite degree of
> learning, skill, and ability necessary to the practice of his
> profession and which others similarly situated ordinarily possess;
> (2) he will exert his best judgment in the prosecution of the
> litigation entrusted to him; and (3) he will exercise reasonable and
> ordinary care and diligence in the use of his skill and in the
> application of his knowledge to his client's cause."

*St. Pius X Houses of Retreats v. Diocese of Camden*, 443 A.2d 1052, 1061 (N.J. 1982) (quoting

*Hodges v. Carter*, 80 S.E.2d 144, 145-46 (N.C. 1954)).

"What constitutes a reasonable degree of care" must be considered "with reference to the

type of service the attorney undertakes to perform."  *Ziegelheim v. Apollo*, 607 A.2d 1298, 1303

(N.J. 1992) (quoting *St. Pius X House of Retreats*, 443 A.2d at 1052).  With specific regard to

settlements, the expected standard of care for attorneys in New Jersey is the same as for all other

litigation matters. *See Ziegelheim*, 607 A.2d at 1304 (recognizing that "litigants rely heavily on

the professional advice when they decide whether to accept or reject offers of settlement" and insisting that lawyers "advise clients with respect to settlements with the same skill, knowledge, and diligence with which they pursue all other legal tasks"). In counseling a client, lawyers must "advise the client of the risks of the transaction in terms which are sufficiently clear to enable the client to assess them." *Dalvin L.L.C v. Daham*, 746 A.2d 1034, 1043 (N.J. Super. Ct. App. Div. 2000) (citing *Conklin v. Hannock Weisman*, 678, A.2d 1060, 1068-69 (N.J. 1996)). "Once the defendant alleges that his conduct comported with the applicable standard of care, the plaintiff must present expert evidence demonstrating that the defendant's conduct failed to meet that standard." *Scott*, 527 F. App'x at 126.

Plaintiff contends Defendant breached its duty of care by misrepresenting the terms of the Cessna Agreement. Specifically, Plaintiff testified that Paul Anapol made oral representations that the periodic payments were guaranteed by Cessna and its insurers. (Pl's Reply 21.) Plaintiff's brother also testified that Paul Anapol said, "These payments are guaranteed and backed by the state of New York." (Pl.'s Reply Ex. A 31.) In further support of this argument, Plaintiff relies on the Recapitulation/Distribution Statement prepared by Defendant and signed by Plaintiff in order to receive his funds from the settlement. (SOMF ¶ 111; RSOMF ¶ 111.) On said Statement, Defendant wrote that the total payout was $6,668,000.000, of which all but the sum of $468,000 was guaranteed by Cessna. (SUF ¶ 48; RSUF ¶ 48; *see* Pl's Resp. Mot. Summ. J. Ex. I.) Given Plaintiff's testimony and the Recapitulation/Distribution Statement, Plaintiff asks this Court to grant him summary judgment on the element of breach and deny Defendant's Motion for Summary Judgment. (Pl's Mot. Summ. J. 6-7.)

Rebutting this proposition, Defendant argues that Plaintiff's testimony should not be credited because it is self-serving, incredulous, and equivocal. (Def's Mot. Summ. J. 22.)

Defendant further contends that Plaintiff has produced no documentary evidence and attempts to diminish the value of the Recapitulation/Distribution Statement.  Defendant argues that the Statement does not contradict the Cessna Agreement because it contains the phrase "Pursuant to the Release and Indemnity Agreement," which clearly and unequivocally released Cessna and its insurers from any legal obligation to make the periodic payments.  (Def's Mot. Summ. J. 26.) Defendant also asserts Plaintiff could not have relied on this representation because the document was prepared after the settlement documents were signed.  (Def's Mot. Summ. J. 26.) Finally, Defendant argues that Paul Anapol's pattern and practice, evidenced by the depositions of his coworkers, demonstrates that he would not have said these payments were guaranteed. (Def's Mot. Summ. J. 27.)

Plaintiff does not rely exclusively on his own testimony but also points to the Recapitulation/Distribution Statement as other evidence of Defendant's misrepresentation.  The Recapitulation/Distribution Statement stated, "The Total Payout, Assuming a 59 Year Life-Expectancy is $6,668,000.00 of Which All but the Sum of $468,000 is Guaranteed by Cessna." (SUF ¶ 48; RSUF ¶ 48; *see* Pl's Resp. Mot. Summ. J. Ex. I.)  This document provides some support to Plaintiff's argument that Defendant misrepresented the Cessna Agreement by indicating the periodic payments were guaranteed by Cessna.[14]  As all parties admit and the

---

[14] The court has already clarified that Cessna was *not* responsible for making these payments under assignment agreement. *See Eric Nels Yerkes v. Cessna Aircraft Co.*, No. 14-cv-05925 (D.N.J.) (emphasis added). Prior to the initiation of this case, Plaintiff sued Cessna and its insurer, Lloyds of London, for breach of contract arising out of the insolvency of ELNY.  (SOMF ¶ 136; RSOMF ¶ 136.)  The Honorable Renee Marie Bumb entered a dispositive Order and Opinion dismissing Plaintiff's claims.  (SOMF ¶ 137; RSOMF ¶ 137; Def.'s Mot. Summ. J. Ex. J.)  Judge Bumb held that all of Cessna and its insurers' obligations for payments under the Release and Indemnity Agreement were validly assigned to ELNY pursuant to the Release and Indemnity Agreement and the Assignment Agreement.  (SOMF ¶ 141; RSOMF ¶ 141; Def.'s Mot. Summ. J. Ex. J.) Judge Bumb stated that the Release and Indemnity Agreement and the Assignment

Honorable Judge Bumb found, the Cessna Agreement clearly and unambiguously released Cessna from all obligations to make these periodic payments to Plaintiff. (SOMF ¶ 143; RSOMF ¶ 143; Pl's Resp. Mot. Summ. J. Ex. J. at 4.) Nevertheless, Defendant argues there are two mitigating factors that severely diminish the evidentiary value of this document.

First, Defendant argues that despite the apparent contradiction, the Statement contained the phrase "*Pursuant* To The Release and Indemnity Agreement." (SUF ¶ 47; RSUF ¶ 47; Pl's Resp. Mot. Summ. J. Ex. I) (emphasis added).[15] Second, Defendant argues that Plaintiff signed the Recapitulation/Distribution Statement after the settlement agreement was signed, so he could not have relied on it when deciding to accept the settlement agreement. Both arguments fail to show the absence of a genuine dispute of material fact. Plaintiff argues this Recapitulation / Distribution Statement is consistent with the misrepresentation of the structured settlement agreement by Defendant. Although Plaintiff could not have relied on this statement when entering into the settlement, it provides some evidence that Defendant may have misrepresented the nature of the settlement during its representation of Plaintiff.[16]

---

Agreement "clearly and unambiguously demonstrate that [Cessna] fulfilled their contractual obligations by making a lump-sum payment, purchasing an annuity and assigning it to FEC." (SOMF ¶ 143; RSOMF ¶ 143; Def.'s Mot. Summ. J. Ex. J. at 4.) Therefore, the Recapitulation/Distribution Statement is incorrect insofar as it indicates Cessna guaranteed any portion of these payments.

[15] The Release & Indemnity Agreement was part of the overall settlement. It provided that once Cessna and its users purchased an annuity and assigned it to First Executive Corporation, they were no longer liable for paying the annuity. *See* Def.'s Mot. Summ. J. Ex. G.

[16] Defendant's representation of Plaintiff would not have ended before Plaintiff signed the Recapitulation/Distribution statement because he did not receive the proceeds of the settlement yet. The Recapitulation/Distribution Statement had to be signed by the client before the client would receive the proceeds of the settlement. (SOMF ¶ 111; RSOMF ¶ 111.) Defendant argues there was no misrepresentation because they defined guarantee differently than it would otherwise be commonly understood. Defendant's expert contends "[t]he 'guaranty' in the Release Agreement to make the periodic payments was for a period of 20 years. There was no misrepresentation by Anapol. Even if Plaintiff was told that the payments were 'guaranteed,' they were guaranteed in at least two respects (i.e., for 20 years and also by the New York

At this stage, the court must not "weigh the evidence and determine the outcome, but only to decide if an issue of material fact existed." *Gilhooley v. County of Union*, 753 A.2d 1137, 1145 (N.J. 2000) (citing *Brill v. Guardian Life Ins. Co. of America*, 666 A.2d 146, 156 (N.J. 1995)). Between Plaintiff's testimony, his brother's testimony, and the Recapitulation/Distribution Agreement, there is sufficient evidence to raise a genuine dispute of material fact regarding whether Defendant misrepresented the terms of the settlement.[17]   If Defendant had misrepresented the terms of the Cessna Agreement to Plaintiff, this conduct could constitute a breach of the standard of care owed by Defendant to Plaintiff. *See Ziegelheim*, 607 A.2d at 1304 (noting client's heavy reliance on Defendant's legal counsel when determining whether to accept a settlement agreement). However, the element of breach of Plaintiff's claim turns on credibility determinations regarding expert witnesses, Plaintiff, and witnesses who testified to Paul Weiss's patterns and practices. "Where issues of credibility are presented, summary judgment is generally inappropriate." *Singer v. Beach Trading Co.*, 876 A.2d 885, 890

---

Guaranty Fund)." Although the annuity was technically backed by the New York Guaranty Fund, the fund did not guarantee the full annuity. Indeed, the fund did not even provide half the annuity's payment. (SOMF ¶¶ 59-60; RSOMF ¶¶ 59-60.)

[17] This Court is not permitted to discredit Plaintiff's testimony for purposes of summary judgment because doing so would constitute a credibility determination. *Aiello v. Zawistowski*, No. A-1244-16T2, 2018 N.J. Super. Unpub. LEXIS 1636 at *5 (N.J. Super. Ct. App. Div. July 11, 2018) ("Apparently, the court did not believe Plaintiff's deposition testimony, which in deciding summary judgment—not sitting as a factfinder at trial—was an inappropriate determination of his credibility."). During Plaintiff's deposition, he stated that Defendant assured him the structured settlement was guaranteed by Cessna, as well as guaranteed and backed by the state of New York. (SUF ¶ 25; RSUF ¶ 25; SOMF ¶ 72; RSOMF ¶ 72.) Plaintiff also asserted that Defendant said "those payments would be *made no matter what*. If the insurance company didn't pay it, Cessna would pay it . . . [e]ither Cessna would pay it or their re-insurers would pay it." (SUF ¶ 27; RSUF ¶ 27.) Plaintiff's brother, Johnson Yerkes, who was also present at the meeting, testified he remembered Defendant saying, "I think this is in your best interest, in the long run, you'll make more money, you're *guaranteed* for life, and this'll take care of you, because when you get older you can have serious complications from the accident." (SOMF ¶ 75; RSOMF ¶ 75) (emphasis added).

(N.J. Super. Ct. App. Div. 2005) (citing *Brill*, 666 A.2d at 156). Accordingly, both parties'
motions regarding the element of breach of the standard of care must be denied.

### (3) Proximate Causation

Defendant next argues the "sole evidence of record regarding proximate causation is
Plaintiff's allegation that he would not have accepted the payment but for the alleged oral
assurances that the payments were guaranteed by Cessna." (Def's Mot. Summ. J. 28.) To that
end, Defendant argues that Plaintiff cannot prove proximate causation because he cannot
affirmatively say he would have done anything differently, as evidenced by Plaintiff's testimony
that he "did not know what he would have done back then" if Paul Anapol only told him that the
settlement was guaranteed by Executive Life and backed by New York. (Def's Mot. Summ. J.
Ex. A 36.) In response, Plaintiff rejects Defendant's assertion that the only evidence of causation
comes from Plaintiff's allegation about what he would have done.

"To establish the requisite causal connection between a defendant's negligence
and plaintiff's harm, plaintiff must present evidence to support a finding that defendant's
negligent conduct was a 'substantial factor' in bringing about plaintiff's injury even though there
may be other concurrent causes of the harm." *Froom v. Perel*, 872 A.2d 1067, 1076 (N.J. Super.
Ct. App. Div. 2005) (citing *Conklin*, 678 A.2d at 1070-72). "The substantial factor test accounts
for the fact that there can be any number of intervening causes between the initial wrongful act
and the final injurious consequences and does not require an unsevered connecting link between
the negligent conduct and the ultimate harm." *Conklin*, 678 A.2d at 1072. "The burden
of proving the causal relationship rests with the client and cannot be satisfied by 'mere
conjecture, surmise or suspicion.'" *CCC Atl., LLC v. Rosenzweig*, No. 18-17433, 2020 U.S.

Dist. LEXIS 40971, at *10 (D. N.J. Mar. 10, 2020) (quoting *Sommers v. McKinney*, 670 A.2d 99,

104 (N.J. Super. Ct. App. Div. 1996)).

Here, Plaintiff's expert rendered an opinion on the issue of proximate causation:

> Anapol Weiss's departures from the standard of care as set forth above,
> were substantial factors in causing plaintiff's damages. Anapol Weiss was
> required to protect its client's interests by obtaining the requisite guaranty
> and backing for the structured settlement. It did not. When ELNY met
> with liquidation, there was no security upon which Eric could fall back on.

(Pl.'s Reply Ex. L 26.)

Defendant contends Plaintiff's only evidence of causation comes from vague theoretical

suggestions by his own expert.  (Def's Response Pl's Reply 10, ECF No. 114.)  Defendant

challenged the credentials of Plaintiff's expert witness and cited the concession by Mr.

Wasserman that it was prudent to settle the case with a structured settlement and that assignment

agreements go "hand-in-hand" with structured settlements.  (Def's Response Pl's Reply 11.)

However, relying on *Conklin v. Hannoch Weisman*, Plaintiff maintains the concurrent

independent causes of harm in this case are ELNY's insolvency and Defendant's potential

negligence.  Plaintiff further notes that Defendant's expert witness did not render an opinion on

the issue of proximate causation. 678 A.2d 1060, 1073 (N.J. 1996) (holding in cases with

concurrent independent causes of harm, "a jury must be instructed to determine whether the

negligence was a substantial factor in bringing about the ultimate harm.").

In *Conklin*, Plaintiffs retained Defendant, a law firm, to represent them in the sale of their

land.  *Id.* at 1062.  Defendant negotiated the contract for the sale of land, and the parties agreed

that the buyer's purchase-money mortgage would be "subordinate to one or more institutional

construction mortgages."  *Id.*  Several years later, the buyer of Plaintiff's land defaulted, entered

bankruptcy, and other mortgage lenders had priority and foreclosed the land.  *Id.* at 1063.  In

total, Plaintiffs "lost the $9 million owed to them under the contract of the sale as well as their land." *Id.* Plaintiffs filed suit alleging Defendant negligently drafted the contract and failed to explain the meaning and risks of subordination clearly. *Id.* Remanding the case for retrial after the jury found no proximate causation, the court noted that "although it may not have been foreseeable that the buyer would become insolvent, the consequences of insolvency were always plainly foreseeable." *Id.* at 1073.

Here, Plaintiff retained Defendant to represent him in litigation against Cessna and Grand Canyon Airways. (SOMF ¶ 3; RSOMF ¶ 3.)[18] Per the structured settlement negotiated by Defendant, ELNY was responsible for paying Plaintiff's annuity (a lifetime benefit), but when ELNY became insolvent, Plaintiff's lifetime payments were reduced by 56.4%. (SOMF ¶ 59; RSOMF ¶ 59.) Like in *Conklin*, the consequences of insolvency of the insurance company were always plainly foreseeable, even if the insolvency of the insurance company was not. Because Defendant failed to protect Plaintiff's annuity or adequately advise Plaintiff of the consequences of this risk, Plaintiff suffered a reduction in his lifetime payments. (Pl's Resp. Ex. K 8.) Because a reasonable jury could find that Defendant was negligent, his negligence could constitute a substantial factor in the ultimate loss suffered by Plaintiff.

In this case, there were concurrent independent causes for Plaintiff's undisputed injury. The insolvency of ELNY directly and independently reduced Plaintiff's lifetime benefit per the Cessna agreement. Given the court's holding in *Conklin* and the opinion rendered by Plaintiff's expert witness, however, a reasonable jury could find that Defendant's failure to obtain a

---

[18] Although not dispositive of the issues herein, the court notes that Defendant concedes they charged a contingency fee not allowed under New Jersey law. Def's Mot. Summ. J. 35 ("Anapol charged Plaintiff a 40% contingent fee . . . [t]his was clearly not allowed under New Jersey Law.").

guarantee on the annuity or Plaintiff's testimony that Defendant misrepresented the terms of the agreement was a substantial factor in causing the harm Plaintiff suffered.  Accordingly, this Court finds a genuine dispute of material fact on the elements of breach and proximate causation, thereby precluding summary judgment.

## V.    CONCLUSION

Because Plaintiff has established the element of duty and provided sufficient evidence to show a genuine dispute of material fact on the elements of breach and causation for his legal malpractice claim, Defendant's Motion for Summary Judgment is denied. Plaintiff's Partial Motion for Summary Judgment is granted on the element of duty and denied on the element of breach.

An appropriate Order follows.

BY THE COURT:

/s/ C. Darnell Jones, II     J.